IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

PHYLLIS POLLARD, )
)
PLAINTIFF, )
)
VS. )
) DOCKET NUMBER
METRO DENTAL, LLC, ) 1:14-CV-2796-LMM
)
DEFENDANT. ) ATLANTA, GEORGIA
) APRIL 25, 2016
)
_______________________________)

VOLUME 1 OF 4
TRANSCRIPT OF JURY TRIAL PROCEEDINGS
BEFORE THE HONORABLE LEIGH MARTIN MAY,
UNITED STATES DISTRICT JUDGE

APPEARANCES:

FOR THE PLAINTIFF: KIMBERLY MARTIN & THOMAS MARTIN
MARTIN & MARTIN, LLP
TUCKER, GEORGIA 30085

FOR THE DEFENDANT: AUBREY VILLINES, JR.
OFFICE OF AUBREY VILLINES, JR.
ATLANTA, GEORGIA 30341

*MECHANICAL STENOGRAPHY OF PROCEEDINGS*
*AND COMPUTER-AIDED TRANSCRIPT PRODUCED BY*

OFFICIAL COURT REPORTER: MONTRELL VANN, RPR, RMR, RDR, CRR
2160 UNITED STATES COURTHOUSE
75 TED TURNER DRIVE, SOUTHWEST
ATLANTA, GEORGIA 30303
(404)215-1549

# I N D E X

| | PAGE |
|---|---|
| PLAINTIFF'S WITNESS | |
| PHYLLIS POLLARD | |
| DIRECT EXAMINATION BY MS. MARTIN | 23 |
| CROSS-EXAMINATION BY MR. VILLINES | 70 |
| REDIRECT EXAMINATION BY MS. MARTIN | 88 |
| REPORTER'S CERTIFICATE | 96 |

*(IN ATLANTA, FULTON COUNTY, GEORGIA, APRIL 25, 2016, IN OPEN COURT.)*

THE COURT: OKAY. YOU MAY BE SEATED. ANYTHING WE NEED TO TAKE UP BEFORE WE PROCEED TO OPENING STATEMENTS?

MS. MARTIN: NO, YOUR HONOR.

MR. VILLINES: I BROKE A TOOTH AT LUNCH, YOUR HONOR, BUT I'LL DEAL WITH THAT LATER.

THE COURT: OKAY. WELL, THAT'S NO FUN.

MR. VILLINES: NO, IT'S NOT ANY FUN. I HAD DR. HENSON LOOK AT IT BRIEFLY.

THE COURT: WELL, I GUESS IF THERE'S A CASE WHERE YOU WANT TO DO THAT, IT MAY BE THIS ONE. WELL, IF ANYTHING COMES UP THAT WE NEED TO DEAL WITH THAT WITH REGARD TO THAT, LET ME KNOW.

MR. VILLINES: NOTHING, YOUR HONOR.

THE COURT: OTHERWISE WE CAN BRING THE JURY IN. THANK YOU.

(JURY PRESENT.)

THE COURT: Y'ALL CAN HAVE A SEAT. WE'RE MISSING ONE OF YOU, SO WE'LL WAIT JUST ONE SECOND.

OKAY. YOU CAN ALL BE SEATED.

AND, MS. MARTIN, YOU CAN PROCEED WITH YOUR OPENING STATEMENTS.

MS. MARTIN: THIS CASE IS ABOUT SEXUAL HARASSMENT. IT'S ABOUT RETALIATION. IT'S ABOUT A BUSINESS OWNER WHO THINKS HE'S ABOVE THE LAW. IT'S ABOUT TARGETING AN EMPLOYEE WHO'S

VULNERABLE, AND TODAY WE HOPE IT'S ABOUT JUSTICE. I INTRODUCED MYSELF EARLIER, BUT I'M GOING TO DO IT AGAIN. I'M KIMBERLY MARTIN. MY PARTNER, TOM MARTIN, AND OUR CLIENT IS PHYLLIS POLLARD. MS. POLLARD IS THE PLAINTIFF IN THIS CASE AND SHE HAS SUED HER FORMER EMPLOYER, METRO DENTAL, LLC, THE DEFENDANT IN THIS CASE. SHE WILL TELL YOU THAT ITS OWNER, DR. DOUG HENSON, REPEATEDLY SEXUALLY HARASSED HER, AND WHEN SHE COMPLAINED, HE TERMINATED HER.

I WANT TO THANK YOU FOR YOUR SERVICE. I KNOW THAT THERE ARE A LOT OF OTHER PLACES THAT YOU COULD BE TODAY. BUT WE ARE THANKFUL THAT YOU'RE HERE. MS. POLLARD HAS WAITED FOUR AND A HALF YEARS TO GET HERE, FOUR AND A HALF YEARS TO GET TO THIS MOMENT, FOUR AND A HALF YEARS TO GET TO PRESENT HER CASE TO YOU, SO THANK YOU. OVER THE COURSE OF THE NEXT DAY OR TWO YOU'RE GOING TO HEAR A STORY, A STORY ABOUT A BUSINESS OWNER WHO SEXUALLY HARASSED AN EMPLOYEE. AND YOU'LL HEAR ABOUT THE CONSEQUENCES OF THAT SEXUAL HARASSMENT. YOU'LL HEAR HE TERMINATED HER WHEN SHE COMPLAINED AND YOU'LL HEAR FROM OUR CLIENT THE EMPLOYEE HERSELF, THE VICTIM OF THE SEXUAL HARASSMENT AND RETALIATION.

LET ME TELL YOU A LITTLE BIT ABOUT THE CORPORATION, THE COMPANY, HOW IT WAS RUN. YOU'LL HEAR THAT THE BUSINESS WE'RE TALKING ABOUT IS THE DENTURE PLACE. NOW, THE DENTURE PLACE IS NOT JUST ONE OFFICE. IT'S NOT EVEN -- THE ONLY NAME USED FOR EVEN A LEGAL NAME. YOU'LL HEAR THERE WAS A DENTURE PLACE

MCDONOUGH, LLC. L.L.C. STANDS FOR LIMITED LIABILITY COMPANY. I DON'T KNOW IF Y'ALL CAN READ THAT, BUT THERE WAS THE MCDONOUGH OFFICE, THE LEGAL NAME, THE DENTURE PLACE, LLC. BUT THERE WAS ALSO METRO DENTAL, LLC IN ATLANTA. AND THAT WAS LOCATED ON CLEVELAND AVENUE. YOU'LL SEE IN THEIR MARKETING MATERIALS THAT DR. HENSON MARKETED THESE OFFICES COLLECTIVELY AS THE DENTURE PLACE. THIS IS THE DOING BUSINESS AS.

YOU'LL HEAR THAT THE TWO OFFICES WERE OWNED BY DR. HENSON. YOU'LL HEAR THAT THE TWO OFFICES PROVIDED THE SAME THING, GENERAL DENTISTRY AS WELL AS DENTURES, BRIDGES AND THAT SORT OF THING. SOMETIMES IN THIS TRIAL YOU'LL HEAR WITNESSES CALL IT THE MCDONOUGH OFFICE OR THE ATLANTA OFFICE. THAT'S AN EASIER WAY TO REMEMBER THESE, BUT WHEN YOU LOOK AT THESE AND YOU HEAR THE TWO OFFICES, IT'S JUST RELATED TO WHERE THEY'RE LOCATED. YOU'LL HEAR THAT THESE OFFICES ARE CONNECTED BECAUSE THEY'RE MANAGED BY DR. HENSON THROUGH HIS DAUGHTER AND HIS SON-IN-LAW. YOU'LL HEAR TESTIMONY THAT EMPLOYEES ARE TRANSFERRED FROM ONE OFFICE TO THE OTHER TO FILL IN NECESSARY (VERBATIM) OR TO FILL IN PERMANENTLY. YOU'LL HEAR DR. HENSON HIMSELF WHO IS BACK AND FORTH AND SEES PATIENTS AT THESE TWO OFFICES. YOU'LL HEAR THAT WHEN THEY'RE MISSING SUPPLIES AT ONE OFFICE, SUPPLIES ARE TRANSFERRED. YOU'LL HEAR THAT PATIENTS CAN BE SEEN AT EITHER OFFICE OR GO BACK AND FORTH. YOU'LL HEAR THAT THEY WERE JOINTLY RUN AS A SINGLE INTEGRATED EMPLOYER.

NOW, REMEMBER JUDGE MAY MENTIONED EARLIER THAT BESIDES

SEXUAL HARASSMENT AND RETALIATION, THAT THERE IS AN ISSUE IN THIS CASE REGARDING THE NUMBER OF EMPLOYEES TO BE COUNTED FOR TITLE VII TO APPLY, AND THAT'S WHY I'VE EXPLAINED THE CORPORATE STRUCTURE TO YOU.

LET ME TELL YOU A LITTLE BIT ABOUT OUR CLIENT, MS. POLLARD. MS. POLLARD WILL TELL YOU THAT WHEN SHE WAS YOUNG, TOO YOUNG, SHE GOT PREGNANT. SHE WAS A TEENAGER, BUT SHE TOOK ON HER RESPONSIBILITY. SHE GOT A JOB. SHE GRADUATED FROM HIGH SCHOOL. SHE WENT TO COMMUNITY COLLEGE. SHE GRADUATED. SHE WENT TO DENTAL ASSISTANT SCHOOL TO BETTER HER LIFE, TO BETTER THE LIFE OF HER SONS. SHE GRADUATED AND SOON MOVED TO GEORGIA.

MS. POLLARD WILL TELL YOU THAT SHE WORKED AT MACY'S WHILE SHE LOOKED FOR A JOB IN A DENTAL OFFICE, AND THEN SHE GOT ONE WITH A DENTAL OFFICE IN MCDONOUGH. DR. HENSON HAD HIRED HER TO WORK AT THE DENTURE PLACE, MCDONOUGH. I'M SORRY. AND AS I TOLD YOU EARLIER, DR. HENSON HIRED HIS DAUGHTER AND SON-IN-LAW TO RUN THE OFFICES, AND HIS DAUGHTER, JENNIFER FLAGGS, IS THE OFFICE MANAGER OF THE DENTURE PLACE IN MCDONOUGH. WHILE MS. POLLARD WORKED AT THE DENTURE PLACE MCDONOUGH OFFICE, YOU'LL HEAR THERE WERE NO PROBLEMS. MS. POLLARD SHOWED UP ON TIME. SHE PERFORMED HER WORK WELL. SHE WAS KIND AND RESPECTFUL TO PATIENTS. THE PATIENTS LOVED HER. SHE WAS NEVER WRITTEN UP. SHE WAS NEVER COUNSELED FOR POOR BEHAVIOR. SHE WAS NEVER SUSPENDED. THEN IN THE SPRING OF 2011, MS. POLLARD WAS GIVEN THE OPTION TO TRANSFER TO THE ATLANTA OFFICE. MS. POLLARD AGREED TO THE TRANSFER SO

SHE COULD BE CLOSER TO HOME, CLOSER TO HER SONS. AND MR. FLAGGS, DR. HENSON'S SON-IN-LAW, RUNS THE ATLANTA OFFICE. AT THE ATLANTA OFFICE, MR. FLAGGS ASSIGNED MS. POLLARD TO THE FRONT DESK AS THE CHECK-OUT PERSON. AGAIN, MS. POLLARD WILL TELL YOU THAT SHE SHOWED UP ON TIME, POLITE TO HER PATIENTS, THE PATIENTS LOVED HER, SHE DID HER JOB WELL, SHE TOOK HER JOB SERIOUSLY. SHE'S A SINGLE MOTHER. SHE NEEDED TO PAY HER BILLS, AND SHE WAS DOING WHAT SHE WAS SUPPOSED TO BE DOING AS A MOM, AS A SISTER, AS A DAUGHTER. AND THEN IT ALL STARTED, SLOWLY AT FIRST. MS. POLLARD WILL TESTIFY THAT SHORTLY AFTER SHE BEGAN WORKING IN ATLANTA, DR. HENSON CALLED HER INTO HIS OFFICE TO ASK ABOUT A TRIP MS. POLLARD HAD TAKEN BACK HOME TO BIRMINGHAM. MS. POLLARD WILL TELL YOU THAT SHE EXPLAINED TO DR. HENSON THAT SHE HAD GONE BACK HOME TO SUPPORT HER MOTHER BECAUSE HER BROTHER WAS SICK, VERY SICK. MS. POLLARD'S BROTHER HAS BIPOLAR DISORDER, AND THERE ARE TIMES WHEN MS. POLLARD NEEDS TO HELP HER MOTHER WITH THE ISSUES SURROUNDING HER BROTHER AND ILLNESS. MS. POLLARD WILL TELL YOU THAT DR. HENSON SEEMED TO UNDERSTAND. HE TOLD HER HE KNEW ABOUT BIPOLAR DISORDER AND WHAT A STRUGGLE IT WAS FOR FAMILY. MS. POLLARD FELT HE WAS SOMEONE WHO COULD RELATE TO THIS ISSUE WHEN NOT MANY PEOPLE CAN. BUT THEN THE CONVERSATION SHIFTED. MS. POLLARD WILL TELL YOU THAT DR. HENSON ASKED WHETHER SHE WAS SEXUALLY ACTIVE. SHE SAID NO. AND HE ASKED HER WHAT SHE USED FOR SEXUAL PLEASURE. MS. POLLARD WAS STUNNED. SHE DIDN'T KNOW WHAT TO SAY. SHE DIDN'T KNOW WHAT TO

DO. SHE TOLD DR. HENSON SHE NEEDED TO GO BACK TO WORK, AND SHE DID. SHE WENT BACK TO WORK CONFUSED BY WHAT HAD JUST HAPPENED.

MS. POLLARD WILL TELL YOU THAT ONCE SHE HAD GOTTEN TO THE ATLANTA OFFICE, SHE HAD HEARD THAT DR. HENSON WAS DATING AN EMPLOYEE AND MAYBE HE WAS JUST FEELING HER OUT TO SEE IF SHE WAS INTERESTED TOO. SHE DIDN'T WANT ANY PART OF IT. SHE WALKED OUT. SHE THOUGHT IT WAS OVER. SHE THOUGHT, I KNOW HOW TO HANDLE THIS. I WALKED OUT, IT'S HANDLED. BUT IT WASN'T HANDLED. IT WAS JUST THE BEGINNING. OVER TIME MS. POLLARD WILL TELL YOU THAT DR. HENSON WOULD CALL HER INTO HIS OFFICE, ASKED HER WHERE SHE LIVED. HE WANTED TO COME OVER. HE WOULD TRY TO KISS HER. HE RUBBED HER THIGHS. SHE WILL TELL YOU SHE TURNED HER HEAD AWAY FROM HIM, SHE TOLD HIM NO, NO, NO. SHE WILL TELL YOU THAT SHE WOULD GO STRAIGHT TO MR. FLAGGS, SHE COMPLAINED TO HIM. SHE TOLD HIM, DR. HENSON TOUCHED ME. MR. FLAGGS, DR. HENSON'S SON-IN-LAW, WOULD TELL HER, I'LL HANDLE IT, I'LL TALK TO HIM. SHE'LL TELL YOU WHEN IT HAPPENED SHE WAS SICK, SHE WAS DISGUSTED. BUT MR. FLAGGS SAID HE WOULD HANDLE IT. IT WAS HIS FATHER-IN-LAW. HE WOULD TAKE CARE OF IT. RIGHT? WELL, YES, FOR A WHILE IT SEEMED LIKE IT WAS HANDLED. MS. POLLARD WILL TELL YOU THAT SHE RETURNED TO WORK, THINGS WERE GOOD, SHE DID HER JOB. DR. HENSON WASN'T THERE EVERY DAY. IT SEEMED MR. FLAGGS HAD TAKEN CARE OF THE SITUATION. THINGS WERE GOOD. SHE'LL TELL YOU THAT THERE WERE NO SEXUAL HARASSMENT POLICIES, NO RULES ON WHAT TO DO, WHO TO TALK TO, HOW TO MAKE IT STOP. SO

SHE JUST COMPLAINED TO MR. FLAGGS, THE OFFICE MANAGER, THE SON-IN-LAW. AND FOR A WHILE IT SEEMED TO WORK. BUT IT HAPPENED AGAIN, MORE INAPPROPRIATE QUESTIONS, MORE INAPPROPRIATE ACTIONS. MS. POLLARD COMPLAINED AGAIN TO MR. FLAGGS. AND THEN IN SEPTEMBER 2012 IT HAPPENED. YOU WILL HEAR MS. POLLARD SAY THAT IN SEPTEMBER 2012 MR. FLAGGS TOLD HER THAT DR. HENSON WANTED TO SEE HER IN HIS OFFICE. MR. FLAGGS TOOK OVER HER DUTIES AT THE FRONT DESK AND TOLD HER, I'M RIGHT HERE. LIKE HE KNEW HE HAD TO PROTECT HER. MS. POLLARD WENT TO DR. HENSON'S OFFICE AND SHE'LL TELL YOU THAT HE TOLD HER TO SIT DOWN, HE WAS HER BOSS. SHE SAID NO. SHE STAYED STANDING UP. BUT DR. HENSON CAME AROUND THE DESK TOWARD HER. HE GRABBED HER. HE GRABBED HER PANTS. HE PUT HIS HAND DOWN HER PANTS. HE GRABBED HER BREAST. SHE GRABBED HIS HAND. SHE SAID, DON'T YOU EVER TOUCH ME NO MORE. SHE RUSHED OUT OF THE OFFICE AND WENT STRAIGHT TO MR. FLAGGS AND TOLD HIM. SHE TOLD HIM, DR. HENSON PUT HIS HANDS DOWN MY PANTS. HE TOUCHED ME. SHE WAS UPSET. SHE WAS FRANTIC. SHE'LL TELL YOU THAT MR. FLAGGS TOLD HER, I DON'T KNOW WHAT TO SAY, I'VE ALREADY SAID SOMETHING TO HIM. SHE'LL TELL YOU AFTER THAT AFTER SHE SAT AT HER DESK, SHE WAS SHAKING, SHE WAS NERVOUS, SHE WAS UPSET. SHE KNEW SHE NEEDED TO GET ANOTHER JOB. SHE WAS A SINGLE MOM, TWO BOYS AT HOME. SHE COULDN'T JUST QUIT WITHOUT ANOTHER JOB LINED UP. BUT SHE WOULD NEVER LET HIM TOUCH HER AGAIN. BUT SHE NEEDED TO LEAVE. MS. POLLARD WILL TELL YOU THAT SHE RETURNED TO WORK AFTER THE SEPTEMBER INCIDENT. DR. HENSON

REFUSED TO SPEAK TO HER, WHICH WAS FINE WITH HER. SHE STARTED WORKING ON A PLAN TO LEAVE. SHE KNEW SHE HAD TO LEAVE BECAUSE SHE KNEW SHE WAS GOING TO BE FIRED, FIRED BECAUSE SHE TOLD MR. FLAGGS, FIRED BECAUSE SHE TOLD DR. HENSON'S SON-IN-LAW WHAT HE WAS DOING. SHE NEEDED ANOTHER JOB. MR. FLAGGS HAD SAID HE WOULD PROTECT HER, BUT THERE WAS NO PROTECTION.

MS. POLLARD WILL TELL YOU THAT JUST A FEW WEEKS AFTER THE SEPTEMBER INCIDENT, AFTER SHE COMPLAINED TO MR. FLAGGS THAT DR. HENSON HAD GRABBED HER, HAD PUT HIS HAND DOWN HER PANTS AND MADE HER FEEL DIRTY, DISGUSTED, JUST A FEW WEEKS LATER MR. FLAGGS TOLD HER THAT DR. HENSON SAID HE HAD TO FIRE HER. ON OCTOBER 5TH, 2012, RATHER THAN STOP THE SEXUAL HARASSMENT, THE TOUCHING, THE GRABBING, THE ABUSE, MS. POLLARD WILL TELL YOU SHE WAS TERMINATED. MR. FLAGGS HANDED HER A SEPARATION NOTICE. MS. POLLARD WALKED TO HER DESK, SHE GOT HER SONS' PICTURES, SHE GOT HER PURSE, AND THEN DR. HENSON WALKED UP AND SAID, GIVE ME A HUG. MS. POLLARD JUST WALKED OUT THE FRONT DOOR, TERMINATED, TWO SONS AT HOME, SHE HAD BEEN GRABBED, SHE HAD BEEN TOUCHED, SHE HAD PLEADED FOR HELP, SHE WAS THROWN AWAY, SHE FELT DISPOSABLE.

THE SEPARATION NOTICE THAT MR. FLAGGS GAVE HER, REASON FOR SEPARATION, LACK OF WORK. IF FOR OTHER THAN LACK OF WORK, STATE FULLY AND CLEARLY THE CIRCUMSTANCES OF THE SEPARATION, NOTHING. SO LACK OF WORK. MS. POLLARD WILL TELL YOU THIS DIDN'T MAKE SENSE. THIS WAS A LIE. HOW COULD THERE BE LACK OF WORK? SHE

WAS HIRED IN MARCH 2011. DR. HENSON HIRED ANOTHER FRONT DESK EMPLOYEE IN JULY OF 2012, JUST A FEW MONTHS BEFORE SHE WAS TERMINATED. AND JUST A FEW WEEKS BEFORE SHE WAS TERMINATED DR. HENSON HAD HIRED ANOTHER FRONT DESK EMPLOYEE. MS. POLLARD WILL TELL YOU THAT LACK OF WORK DIDN'T MAKE SENSE, BUT SHE KNEW WHAT HAPPENED. MS. POLLARD WILL TELL YOU THAT ALL ALONG SHE HAD BEEN TELLING HER AUNT WHAT HAD BEEN HAPPENING. AND WHEN SHE TOLD HER AUNT THAT DR. HENSON HAD TERMINATED HER, HER AUNT TOLD HER TO IMMEDIATELY CONTACT THE E.E.O.C., THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION. YOU WILL HEAR THAT WITHIN JUST A FEW DAYS OF THE TERMINATION, MS. POLLARD HAD FILLED OUT AND SIGNED HER E.E.O.C. DOCUMENTS. JUST A FEW DAYS AFTER HER EMPLOYMENT WAS TERMINATED SHE TOLD THE E.E.O.C. THAT DR. HENSON HAD GRABBED HER, HAD TOUCHED HER, HAD PUT HIS HANDS DOWN HER PANTS. SHE TOLD THE E.E.O.C. ABOUT THE TIMES SHE COMPLAINED, ABOUT HOW SHE THOUGHT MR. FLAGGS HAD TAKEN CARE OF IT, AND FOR A WHILE MAYBE HE DID. BUT IT HAPPENED AGAIN AND IT WAS WORSE. WITHIN DAYS OF HER TERMINATION SHE TOLD THE E.E.O.C. THAT DR. HENSON TOLD MR. FLAGGS TO TERMINATE HER AND GAVE HER A NOTICE OF SEPARATION THAT SAID FOR LACK OF WORK. AND THEN AS THE LEGAL PROCESS SO OFTEN WORKS, SHE WAITED. YOU'LL HEAR THAT THE E.E.O.C. CONTACTED DR. HENSON. THE E.E.O.C. ASKED HIM TO RESPOND. FIRST YOU'LL SEE THAT THE E.E.O.C. ASKED DR. HENSON TO PROVIDE PROPER NAME AND ADDRESS OF THE COMPANY. AND HE PROVIDED THAT. YOU'LL HEAR THAT THE E.E.O.C. ASKED DR. HENSON TO STATE THE TOTAL

NUMBER OF PEOPLE WHO WORKED AT THE OFFICE DURING THE RELEVANT TIME PERIOD. AND YOU'LL SEE HE RESPONDED WITH A LIST OF EMPLOYEES. AND THEN YOU'LL SEE THAT THE E.E.O.C. ASKED DR. HENSON TO SUBMIT A WRITTEN STATEMENT ON EACH OF MS. POLLARD'S ALLEGATIONS AND TO PROVIDE ANY EXPLANATION THAT WAS RELEVANT. YOU'LL SEE THAT DR. HENSON -- WELL, DR. HENSON DIDN'T REPLY TO THAT REQUEST. HE SIMPLY LEFT THE QUESTION BLANK, NO RESPONSE, NO RESPONSE TO MS. POLLARD'S ALLEGATION THAT DR. HENSON HAD TOUCHED HER, HAD VIOLATED HER, HAD HARASSED HER, NO RESPONSE TO MS. POLLARD'S ALLEGATION THAT HE TERMINATED HER JUST WEEKS AFTER SHE COMPLAINED, NO STATEMENT TO THE E.E.O.C. THAT MS. POLLARD WAS TERMINATED BECAUSE SHE WAS A BAD EMPLOYEE OR THAT SHE WAS LATE OR THAT SHE DIDN'T GET ALONG WITH OTHER EMPLOYEES OR THAT SHE WAS RUDE TO PATIENTS, NO STATEMENT THAT SHE HAD DONE ANYTHING TO DESERVE TO BE TERMINATED, SIMPLY NO RESPONSE. YOU'LL HEAR THEY DID NOT HAVE A RESPONSE UNTIL, THAT IS, MS. POLLARD FILED A LAWSUIT.

NOW, YOU'LL HEAR DUE TO THE E.E.O.C. RULES SHE WASN'T ALLOWED TO FILE A LAWSUIT FOR TWO YEARS. AND PRIOR TO FILING THE LAWSUIT DR. HENSON HAD NO RESPONSE FOR HER TERMINATION. BUT TWO YEARS LATER WHEN SHE FILED THE LAWSUIT, YOU'LL SUDDENLY HEAR DR. HENSON HAD A RESPONSE. SHE DIDN'T WORK WELL WITH ANOTHER EMPLOYEE, SHE WAS RUDE TO A PATIENT, THERE WERE TOO MANY PEOPLE AT THE FRONT DESK. BUT REMEMBER YOU'LL HEAR THESE RESPONSES DIDN'T COME OUT UNTIL YEARS AFTER DR. HENSON TERMINATED HER.

THEY NEVER CAME OUT IN THE GEORGIA DEPARTMENT OF LABOR UNEMPLOYMENT DOCUMENTS DAYS AFTER SHE WAS TERMINATED. THEY NEVER CAME OUT IN THE FEDERAL E.E.O.C. DOCUMENTS MONTHS AFTER SHE WAS TERMINATED. MS. POLLARD WAS ONLY A BAD EMPLOYEE ONCE SHE FILED A LAWSUIT.

YOU'LL HEAR FROM MS. POLLARD WHAT IT WAS LIKE TO BE TOUCHED, TO BE GRABBED. YOU'LL HEAR WHAT IT WAS LIKE TO BE TERMINATED, A SINGLE MOM WITH TWO BOYS AT HOME. YOU'LL HEAR HER SAY, I WANTED TO FIGHT, I WANTED TO PUNCH HIM, I WANTED TO KICK HIM, BUT I COULDN'T LOSE MY JOB. I WANTED ANOTHER JOB, BUT I HAD TO HAVE ONE LINED UP BEFORE I LEFT. I TOLD YOU EARLIER THAT THIS CASE WAS ABOUT SEXUAL HARASSMENT, IT WAS ABOUT RETALIATION, AND TODAY WE HOPE THAT IT'S ALSO ABOUT JUSTICE. THANK YOU.

THE COURT: OKAY. MR. VILLINES, YOU MAY PROCEED.

MR. VILLINES: THANK YOU, YOUR HONOR. MAY IT PLEASE THE COURT. I MET YOU EARLIER IN THE DAY. I'M AUBREY VILLINES. AND YOU MET DR. HENSON OF METRO DENTAL. WHAT WE ARE DOING HERE TODAY IS OPENING STATEMENT. IT IS NOT EVIDENCE. THE EVIDENCE WILL COME FROM THE STAND AND THE DOCUMENTS, AND THE JUDGE IS GOING TO INSTRUCT YOU ABOUT ALL OF THIS. WHAT WE SAY IS NOT EVIDENCE. IT SHOULD BE A PREVIEW OF THE COMING ATTRACTIONS. I DON'T KNOW IF YOU'LL REMEMBER THE PREVIEW OF THE COMING ATTRACTIONS THAT WE BOTH DEPICT HERE. THEY'RE GOING TO BE VERY DIFFERENT, AND THE EVIDENCE WILL SUPPORT ONE SIDE OR THE OTHER FROM THOSE STANDS (VERBATIM).

I WANT TO THANK YOU FOR COMING IN HERE AND SERVING. I GET CALLS ALL THE TIME FROM MY FRIENDS, I GOT A JURY SUMMONS, HOW CAN I GET OUT OF IT. AND I SAY, YOU WANT SOMEONE LIKE YOURSELF. YOU WANT A PEER SITTING ON THAT JURY. DON'T EVEN TRY TO GET OUT OF IT. DON'T EVEN -- I GO MYSELF. THEY ALWAYS EXCUSE ME, BUT I GO ANYWAY. I WANT TO THANK YOU. I'VE SAID OVER AND OVER AGAIN I SAID, OUTSIDE OF SERVING THE COUNTRY IN THE MILITARY, I THINK THIS IS THE HIGHEST THING YOU CAN DO, AND I APPRECIATE THAT YOU'RE HERE.

AS I SAID, THIS IS A PREVIEW OF COMING ATTRACTIONS, AND WE HAVE A VERY, VERY DIFFERENT STORY WITH A VERY, VERY DIFFERENT SET OF FACTS AND A VERY, VERY DIFFERENT SET OF EVIDENCE. ONE OF THE FIRST THINGS THAT THE EVIDENCE WE THINK IS GOING TO SHOW IS TO TALK ABOUT METRO DENTAL. YOU HEARD ABOUT JOINT MARKETING AND EVERYTHING. I'M GOING TO TELL YOU ABOUT WHAT THE EVIDENCE IS GOING TO SHOW REGARDING THIS CASE. IT IS GOING TO SHOW YOU THAT IT IS A CORPORATION CALLED METRO DENTAL LOCATED ON CLEVELAND AVENUE. AND THEY'RE GOING TO HAVE THE BURDEN OF PROVING ALL THIS, BUT IT'S ALSO GOING TO SHOW YOU THAT THERE'S A DENTAL OFFICE IN STOCKBRIDGE, GEORGIA, A DIFFERENT CORPORATION. AND THAT'S A DIFFERENT CORPORATION AND IT'S CALLED THE DENTURE PLACE. THE EVIDENCE IS GOING TO SHOW THEY HAVE DIFFERENT CORPORATE RECORDS, THEY FILE DIFFERENT INCOME TAXES, THEY HAVE DIFFERENT SALARIES. THEY HAVE DIFFERENT EMPLOYEES. THEY BUY DIFFERENT SERVICES. THEY HAVE DIFFERENT ACCOUNTS, ALL THE

THINGS THAT WOULD SHOW SEPARATION, DIFFERENT SUPPLIES, EVERYTHING IS GOING TO SHOW THAT THESE ARE TWO SEPARATE ENTITIES, TWO SEPARATE CORPORATIONS. IT'S ALSO GOING TO SHOW, THE EVIDENCE, THAT THERE HAVE NOT BEEN 15 EMPLOYEES FOR 20 WEEKS DURING THE TWO YEARS IN QUESTION. IT DOESN'T EXIST. IT'S GOING TO SHOW THAT. THEY ARE VERY, VERY DIFFERENT COMPANIES. YES, THERE WAS SOME WEBSITE THAT SOME ADVERTISING WAS DONE. WE THINK THE EVIDENCE WILL SHOW THAT, THAT THEY BOTH USED THE WEBSITE, BUT ALL THOSE THINGS THAT DEFINED WHAT IS SEPARATE AND DISTINCT ARE GOING TO BE THERE, ARE GOING TO BE THERE.

WE DON'T WANT TO DISPARAGE THE PLAINTIFF IN OUR CASE, BUT WE DO WANT THE TRUTH TO COME OUT AND WE THINK THAT'S WHAT YOU'LL HAVE. WHAT WE EXPECT THAT WILL HAPPEN IS THE EVIDENCE WILL SHOW THAT SHE WENT TO WORK FOR THE OTHER CORPORATION, THE SEPARATE CORPORATION. WE'LL REFER TO IT AS THE DENTURE PLACE IN STOCKBRIDGE. AND SHE WORKED THERE FOR A WHILE, DR. HENSON DOWN THERE AND OTHERS, AND REALLY DIDN'T HAVE TOO MUCH OF A PROBLEM, REALLY DIDN'T HAVE TOO MUCH -- SHE LEFT THERE. AND AFTER BEING GONE FOR A WHILE, THERE WAS AN OPENING AT METRO DENTAL OFF CLEVELAND AVENUE, AND SHE APPLIED FOR THE JOB, AND I THINK SHE'LL TESTIFY THAT WILLIAM FLAGGS, THE OFFICE MANAGER, WHO IS ALSO THE SON-IN-LAW OF DR. HENSON, HIRED HER. SHE WORKED THERE FROM ABOUT FEBRUARY 21ST, 2011, TO 10/21/2012. SHE WAS HIRED TO WORK ON THE FRONT DESK. THAT'S WHAT THE EVIDENCE WILL SHOW, BUT SHE WORKED OUT THERE, BUT IT'S GOING TO SHOW AN ENTIRELY

DIFFERENT EMPLOYEE THAN WHAT YOU JUST HEARD DEPICTED HERE. IT'S GOING TO SHOW SOMEONE WHO DIDN'T GET ALONG WITH THE PATIENTS. IT'S GOING TO SHOW SOMEONE WHO DIDN'T GET ALONG WITH AN EMPLOYEE WHO HAD BEEN THERE FOR 20 YEARS, THAT THE BICKERING BECAME SO BAD THAT WILLIAM FLAGGS, THE OFFICE MANAGER, BROUGHT HER IN TO SAY, HEY, AND TALKED TO HER ABOUT THIS. THEY'RE GOING TO TALK TO -- ABOUT SOME OF THE OTHER PROBLEMS THEY HAD WITH PATIENTS COMING IN. THEY'RE GOING TO TALK ABOUT A PATIENT CALLED UPSHAW THAT CAME IN ON SEPTEMBER 21ST, 2012 RIGHT BEFORE -- RIGHT BEFORE THE TERMINATION. AND SHE HAD AN ABSCESSIVE (VERBATIM) TOOTH. AND WITNESSES ARE GOING TO TESTIFY THAT MS. POLLARD SENT HER AWAY AT 5:00, HAD AN ABSCESSED TOOTH, AND THAT MR. FLAGGS MET THE PATIENT WHO HAD BEEN IN THERE BEFORE IN THE PARKING LOT, AND SHE SAID, YOU KNOW, I'M JUST -- GOT THIS ABSCESS. COME ON BACK IN. AND THEY GAVE HER SOME ANTIBIOTICS TO GET RID OF THE INFECTION BEFORE THEY COULD BRING HER BACK IN AND DO SOMETHING ON IT. AND SHE WAS TALKED TO ABOUT THIS. AND SHORTLY THEREAFTER SHE WAS TERMINATED. AND WE THINK THE EVIDENCE IS NOT GOING TO SHOW THAT IT WAS WAITED (VERBATIM) FOR TWO YEARS OR THREE YEARS OR FOUR YEARS BEFORE ANY DEFENSE WAS RAISED. WE THINK THE EVIDENCE OF PLAINTIFF'S EXHIBIT 1, MS. POLLARD, IS GOING TO SHOW BACK ON 10/21 WHEN WE SEPARATED HER, WE SAID LACK OF WORK AT THAT POINT, NOT FOUR YEARS LATER WHEN WE RAISED THE DEFENSE. WE'VE -- RIGHT THERE THE EVIDENCE WILL SHOW WE SEPARATED FOR LACK OF WORK. MR. FLAGGS IS GOING TO TAKE THE

STAND AND SO IS DR. HENSON AND SAY, WE HAD LACK OF WORK, SO WHY DID YOU CHOOSE MS. POLLARD? WASN'T GETTING ALONG WITH PEOPLE, WASN'T GETTING ALONG WITH MAYBE THE BEST EMPLOYEE THEY HAD, AND TRACY FOR 20 YEARS. TRACY IS GOING TO COME IN HERE AND SAY, OH, SHE HAD AN ATTITUDE, SHE HAD AN ATTITUDE WITH ME, WITH THE STAFF, WITH PATIENTS. AND THEN THE STRAW THAT BROKE THE CAMEL'S BACK, THE ABSCESSED TOOTH.

YOU'RE ALSO GOING TO SEE AT THAT POINT THEY HAD, I BELIEVE, FOUR PEOPLE WORKING THE FRONT DESK. THAT'S WHAT THE EVIDENCE IS GOING TO SHOW. AFTER THEY LET HER GO, IT WAS THREE. THEY'RE GOING TO SAY, WE DIDN'T HAVE THE WORK. AND EVEN TODAY YEARS LATER IT'S STILL THREE AND TWO. IT'S BEEN THREE, IT'S NOW TWO. IT MAY GO BACK AND FORTH, BUT IT'S NEVER GONE BACK UP TO FOUR. THEY DIDN'T HAVE THE WORK. THEY'RE GOING TO TELL YOU THE BUSINESS IS FALLING OFF. AND, YES, WE MADE A DECISION AS TO WHO WE SHOULD LET GO, AND WE LET GO MRS. POLLARD.

THEY'RE ALSO GOING TO TELL YOU SOMETHING ELSE, THAT ALL SHE DID WAS TRY TO SUCK UP TO DR. HENSON, BRING HIM GIFTS, CARDS, T-SHIRTS, EVERYTHING SHE COULD TO SUCK UP TO THE BOSS, BUT HE DIDN'T RESPOND TO IT. MR. FLAGGS IS EVEN GOING TO TELL YOU, SHE EVEN TRIED TO SUCK UP TO ME, SENT ME INAPPROPRIATE TEXTS, INAPPROPRIATE TEXTS ON FATHER'S DAY. DR. HENSON'S GOING TO SAY THAT HE STRUCK A COMMON CORD WITH HER BECAUSE SHE WORKED IN THE OFFICE, BUT MORE SO THEY HAD SPECIAL NEEDS MEMBERS OF THEIR FAMILY. DR. HENSON AND MS. POLLARD, AND THAT WAS A

CONVERSATION, BUT IT WAS NEVER A SEXUAL THING. HE'S GOING TO DENY ANY OF THE SEXUAL INNUENDOS, SEXUAL COMMENTS AND SEXUAL BEHAVIOR THAT HAS ALLEGED -- BEEN ALLEGED BY THE PLAINTIFF. HE'S JUST GOING TO SAY, IT DIDN'T HAPPEN, IT DIDN'T HAPPEN. THE EVIDENCE IS GOING TO SHOW IN THAT SMALL LITTLE OFFICE HE HAS, YOU WOULD HEAR EVERYTHING. OTHERWISE WOULD OVERHEAR EVERYTHING. WHEN SHE WAS TERMINATED THERE WAS ONE OTHER DOCTOR IN THE ROOM, NOT DR. HENSON, DR. CHIN PARK, AND HE'S GOING TO TESTIFY THAT HE WAS THERE AT THE TIME. DR. FLAGGS -- I MEAN, MR. FLAGGS IS GOING TO SAY, SHE NEVER COMPLAINED TO ME, SHE NEVER FILED A COMPLAINT. THERE WILL BE NO TEXT, THERE WILL BE NO E-MAILS, THERE WILL BE NO LETTERS, THERE WILL BE NO DOCUMENTS, THERE WILL BE NOTHING TO SUPPORT HER CLAIM REGARDING THAT, NOTHING, NOTHING.

THE EVIDENCE WILL SHOW THAT AFTER THE TERMINATION, SHE DID GO TO THE E.E.O.C. AND WHEN THEY TALKED ABOUT THE EMPLOYEES, YOU'RE GOING TO SEE MR. FLAGGS SAY, YEAH, I GOT THIS THING. I PUT DOWN EVERYBODY INCLUDING THE JANITOR WHO WORKED AT THE OFFICE WHO ARE NOT EMPLOYEES WHO WORKED AT THE OFFICE. I LISTED EVERYBODY. I WANT TO TRY TO BE ACCURATE. THE EVIDENCE IS GOING TO SHOW THAT THE E.E.O.C. GAVE HER A DISMISSAL, DISMISSED IT WITH NOTICE OF RIGHTS, DISMISSED THE CASE WITH NOTICE OF RIGHTS. THAT'S WHAT THE E.E.O.C.'S GOING TO SHOW.

WHAT ELSE HAPPENED AFTER THIS? THE EVIDENCE WILL SHOW SHE DIDN'T GO TO A DOCTOR, SHE DIDN'T GO TO A THERAPIST, SHE DIDN'T

SEEK OUT HER MINISTER. YOU'RE NOT GOING TO FIND A TRAIL OF ANY DOCUMENTARY EVIDENCE TO SUPPORT THIS POSITION, NONE AT ALL. WE THINK THAT THE EVIDENCE WILL SHOW THAT SHE WAS FIRED BECAUSE THERE WAS LACK OF WORK AND SHE WAS AMONG THE EMPLOYEES TO BE CHOSEN FOR LACK OF WORK, SHE HAD LESS SENIORITY THAN OTHERS, MAYBE MORE THAN SOME, BUT SHE COULD NOT GET ALONG ON THE FRONT DESK, COULD NOT GET ALONG WITH THE FRONT DESK, AND THE ISSUE WITH THE ABSCESSED TOOTH WAS THE STRAW THAT BROKE THE CAMEL'S BACK. TO SOME POINTS IT'S GOING TO BE HE SAID, SHE SAID EXCEPT OTHERS ARE GOING TO SAY, NO, THAT'S NOT THE CASE, SHE WAS NOT A GOOD EMPLOYEE, NO SHE DID NOT COMPLAIN TO US, NO, SHE NEVER SAID DR. HENSON -- IN FACT, THE EVIDENCE IS GOING TO SHOW THAT IN SEPTEMBER SHE CAME TO THE OFFICE PARTY AT HIS HOUSE WITH ALL THE OTHER EMPLOYEES, BROUGHT HER MOTHER AND BROUGHT HER SON, JUST AS HAPPY AS SHE COULD BE. IT DIDN'T HAPPEN. THE EVIDENCE IS GOING TO SHOW SHE'S GOT A SPOTTY WORK HISTORY AND SHE SAW THIS AS A CHANCE TO FINALLY GET SOME MONEY. THANK YOU VERY MUCH.

THE COURT: OKAY. THAT CONCLUDES THE OPENING STATEMENTS IN THE CASE. AND RIGHT NOW WHAT I'M GOING TO DO IS TELL YOU ABOUT SOME STIPULATIONS THAT HAVE BEEN MADE. SOMETIMES THE PARTIES AGREE IN ADVANCE THAT CERTAIN FACTS ARE TRUE. THESE AGREEMENTS ARE CALLED STIPULATIONS. AND YOU MUST TREAT THESE FACTS AS PROVED FOR THIS CASE. I'LL NOW READ THE STIPULATIONS THE PARTIES HAVE MADE IN THE CASE, AND ALSO WHEN I GIVE YOU YOUR CLOSING INSTRUCTIONS I'LL ALSO GIVE YOU THE STIPULATIONS AS WELL

JUST SO THAT YOU MAKE SURE THAT YOU HAVE THOSE. THERE ARE SEVEN STIPULATIONS.

THE FIRST, DEFENDANT METRO DENTAL, LLC IS A DENTAL PRACTICE ON CLEVELAND AVENUE. NUMBER TWO, DR. DOUGLAS HENSON IS THE OWNER OF DEFENDANT AND A PRACTICING DENTIST AT METRO DENTAL, LLC. NUMBER THREE, DR. HENSON ALSO OWNS THE DENTURE PLACE LOCATED IN MCDONOUGH, GEORGIA. NUMBER FOUR, DEFENDANT HIRED PLAINTIFF ON APPROXIMATELY MARCH THE 1ST, 2011 AS A FRONT DESK RECEPTIONIST. NUMBER FIVE, DEFENDANT TERMINATED PLAINTIFF ON OCTOBER THE 5TH, 2012. NUMBER SIX, WILLIAM FLAGGS IS THE MANAGER OF THE CLEVELAND AVENUE DENTAL OFFICE. AND, NUMBER SEVEN, DEFENDANT, METRO DENTAL, DID NOT HAVE A WRITTEN SEXUAL HARASSMENT POLICY DURING THE TIME PERIOD THAT PLAINTIFF WORKED THERE.

SO, AGAIN, THOSE ARE THE STIPULATIONS. AND WHEN I GIVE YOU YOUR CLOSING INSTRUCTIONS, I'LL ALSO GIVE YOU A WRITTEN COPY OF THOSE INSTRUCTIONS AND THOSE STIPULATIONS WILL BE FULLY CONTAINED WITHIN THOSE SO THAT YOU CAN HAVE THOSE AS WELL. SO THAT ENDS THE STIPULATIONS.

AND, PLAINTIFF, YOU CAN BEGIN WITH YOUR PRESENTATION OF EVIDENCE AT THIS POINT IN TIME.

MS. MARTIN: YOUR HONOR, WE ASK FOR THE RULE.

THE COURT: JUST A SECOND, MR. VILLINES.

MR. VILLINES: I JUST WANTED TO INVOKE THE RULE, YOUR HONOR.

THE COURT: OKAY. IT SOUNDS LIKE MS. MARTIN WAS GOING TO DO THE SAME THING.

MS. MARTIN: WE DO.

THE COURT: OKAY. THANK YOU VERY MUCH. LET ME GO AHEAD AND READ THE INSTRUCTION WHILE EVERYONE IS IN THE ROOM SO IT'S CLEAR.

MS. MARTIN: OKAY.

THE COURT: SO THE RULE OF SEQUESTRATION HAS BEEN INVOKED, AND WHAT THAT MEANS IS WITNESSES OTHER THAN THE PARTIES OR THE CORPORATE REPRESENTATIVES MUST NOT BE IN THE COURTROOM WHEN COURT IS IN SESSION. IN ADDITION, WITNESSES CANNOT DISCUSS OR BE TOLD THE SUBSTANCE OF ANY WITNESS TRIAL TESTIMONY. THIS INCLUDES REVIEWING TRIAL TRANSCRIPTS OR DEPOSITIONS THAT WILL BE READ AT TRIAL.

DO COUNSEL UNDERSTAND THE RULE AND PROMISE TO MONITOR THE COURTROOM TO MAKE SURE NO WITNESSES ARE PRESENT WHEN COURT IS IN SESSION?

MS. MARTIN: YES, YOUR HONOR.

MR. VILLINES: YES, YOUR HONOR.

THE COURT: OKAY. THANK YOU VERY MUCH. AND I BELIEVE THAT THERE ARE SOME WITNESSES THAT NEED TO LEAVE AT THIS TIME; CORRECT, OR NOT? IT LOOKS LIKE Y'ALL ARE LOOKING AROUND.

MR. VILLINES: I BELIEVE TWO.

THE COURT: OKAY. AND, JURORS, JUST KIND OF THE NORMAL TALK, EXPLANATION OF THAT, THERE'S JUST A RULE THAT THE

PARTIES CAN REQUEST, THAT MEANS THAT WITNESSES CAN'T BE IN THE COURTROOM WHILE OTHER WITNESSES ARE TESTIFYING. BUT THE PARTIES HAVE A RIGHT TO BE HERE FOR EVERYTHING, SO THEY'LL STAY IN THE COURTROOM THROUGHOUT THE TRIAL.

SO WITH THAT, MS. MARTIN, YOU CAN BEGIN ON BEHALF OF PLAINTIFF.

MS. MARTIN: OKAY. YOUR HONOR, WE CALL PHYLLIS POLLARD TO THE STAND.

THE COURT: OKAY. AND, MS. POLLARD, IF YOU CAN COME RIGHT THERE TO THAT CHAIR IN THE FRONT.

MS. MARTIN: YOUR HONOR, DO YOU MIND IF I MOVE THIS?

THE COURT: NOT AT ALL. IT'S ON WHEELS. IT SHOULDN'T BE TOO BAD.

COURTROOM DEPUTY CLERK: PLEASE RAISE YOUR RIGHT HAND.

(WITNESS SWORN.)

COURTROOM DEPUTY CLERK: YOU MAY BE SEATED.

THE COURT: AND, MS. POLLARD, THE ONLY THING I WILL TELL YOU IS TRY AND BE CAREFUL AND SPEAK INTO THE MICROPHONE AND THAT WAY EVERYBODY CAN HEAR YOU.

THE WITNESS: YES, MA'AM.

THE COURT: THANK YOU.

PHYLLIS POLLARD

CALLED AS A WITNESS BY THE PLAINTIFF, AFTER HAVING BEEN FIRST DULY SWORN, TESTIFIED AS FOLLOWS:

DIRECT EXAMINATION

BY MS. MARTIN:

Q. I'M SORRY. I DIDN'T HEAR WHETHER OR NOT WE ASKED YOUR NAME FOR THE RECORD.

A. MY NAME IS PHYLLIS POLLARD.

Q. OKAY. MS. POLLARD, HOW OLD ARE YOU?

A. I'M 43 YEARS OLD.

Q. AND WHERE DO YOU LIVE?

A. I LIVE IN STOCKBRIDGE, GEORGIA.

Q. WHO DO YOU LIVE WITH?

A. MY SON ARMANI POLLARD.

Q. I'M SORRY?

A. MY SON, ARMANI POLLARD.

Q. AND HOW OLD IS HE?

A. HE'S 16, 16 YEARS OLD.

Q. YOU HAVE TWO OTHER SONS; RIGHT?

A. YES, MA'AM, I DO.

Q. AND HOW OLD ARE THEY?

A. MY OLDEST SON IS 29 YEARS OLD AND MY 22-YEAR-OLD. I HAVE A 22, AND A 29-YEAR-OLD.

Q. MS. POLLARD, WHERE ARE YOU FROM?

A. I'M FROM BIRMINGHAM, ALABAMA.

Q. DID YOU GO TO HIGH SCHOOL THERE?
A. YES, MA'AM, I DID.
Q. DID YOU GRADUATE?
A. YES, MA'AM, I DID.
Q. WHAT YEAR?
A. I GRADUATED IN 1991.
Q. DID YOU GO TO SCHOOL AFTER HIGH SCHOOL?
A. YES, I SURE DID.
Q. WHERE DID YOU GO?
A. I WENT TO LAWSON STATE UNIVERSITY. LAWSON STATE COMMUNITY COLLEGE. I'M SORRY.
Q. AND THAT WAS IN BIRMINGHAM?
A. YES, MA'AM. IT'S IN BIRMINGHAM.
Q. DID YOU GRADUATE?
A. YES, I DID.
Q. DID YOU DO ANY OTHER FURTHER SCHOOLING?
A. YES, MA'AM. I WENT TO UNIVERSITY OF ALABAMA AND TOOK DENTAL ASSISTANT PROGRAM.
Q. DID YOU GRADUATE?
A. YES, MA'AM, I DID.
Q. WHY DID YOU DECIDE TO FURTHER YOUR EDUCATION BY GOING TO THE DENTAL ASSISTANT PROGRAM?
A. JUST BEING A MOTHER I JUST WANTED TO CONTINUE MY EDUCATION AND DO SOMETHING THAT I FELT THAT -- I LIKE TO MAKE PEOPLE HAPPY AND SMILE, SO I GOT INTO THE INDUSTRY. I THOUGHT THAT WAS

SOMETHING FUN.

Q. DID YOU WORK DURING THE TIME THAT YOU WERE IN HIGH SCHOOL?

A. YES, MA'AM, I SURE DID.

Q. WHERE DID YOU WORK?

A. MY FIRST JOB, I WORKED AT PO' FOLKS AS A WAITRESS AND I WORKED AT RALLY'S.

Q. WHAT IS THAT?

A. RALLY'S IS A RESTAURANT, LIKE, A FAST-FOOD RESTAURANT. SO I WORKED AT RALLY'S AFTER PO' FOLKS.

Q. AND WHY DID YOU LEAVE PO' FOLKS?

A. BECAUSE PO' FOLKS WAS REALLY PRETTY MUCH ON THE OTHER SIDE OF TOWN. AND BEING IN THE 10TH GRADE IT BECAME A PROBLEM, YOU KNOW, GETTING BACK AND FORTH.

Q. NOW, DID YOU WORK WHEN YOU WERE IN THE COMMUNITY COLLEGE?

A. YES, MA'AM.

Q. WHERE DID YOU WORK?

A. I WORKED AT J.C. PENNEY'S IN WESTERN HILL MALL. THAT'S IN FAIRFIELD, ALABAMA.

Q. AND WHAT DID YOU DO THERE?

A. I WAS A MAKE-UP ARTIST.

Q. HOW LONG WERE YOU AT J.C. PENNEY'S?

A. SEVEN YEARS.

Q. WHERE DID YOU WORK NEXT?

A. I -- WELL, AFTER I FINISHED UNIVERSITY OF ALABAMA FOR THE DENTAL ASSISTANT PROGRAM, I DID MY INTERNSHIP WITH DR. JACKSON

AT WEST PRINCETON, AND HE HIRED ME ON -- THAT WAS THE FIRST DENTIST I WORKED FOR.

Q. HOW LONG DID YOU STAY AT WEST PRINCETON DENTAL?

A. FIVE -- FIVE YEARS.

Q. AND THAT WAS ALSO IN BIRMINGHAM?

A. YES, MA'AM. IT WAS IN BIRMINGHAM.

Q. AND AT SOME POINT YOU CAME TO ATLANTA; RIGHT?

A. YES, MA'AM.

Q. AND WHY DID YOU COME TO ATLANTA?

A. JUST WANTED CHANGE, GROWTH, YOU KNOW, SOMETHING DIFFERENT. AND I WOULD VISIT MY AUNT. SHE'S BEEN HERE FOR SEVERAL YEARS, AND I WOULD VISIT HER AND I JUST DECIDED TO MOVE HERE.

Q. DID YOU WORK WHEN YOU FIRST CAME TO ATLANTA?

A. NOT WHEN I FIRST CAME, MAYBE A MONTH RIGHT AFTER I GOT HERE I STARTED AT MACY'S IN SOUTHLAKE MALL.

Q. WHAT DID YOU DO THERE?

A. I WAS A MAKE-UP ARTIST AS WELL.

Q. WHERE DID YOU WORK AFTER MACY'S?

A. AFTER MACY'S I STARTED AT DR. -- WELL, IT WAS MCDONOUGH, THE MCDONOUGH OFFICE, THE DENTURE PLACE.

Q. DO YOU REMEMBER APPROXIMATELY WHEN THAT WAS?

A. 2008, I WANT TO SAY I STARTED AT THE DENTURE PLACE. AND I WAS AT MACY'S 2006, AROUND 2006 AT MACY'S.

Q. NOW, WE CAN CALL THIS THE MCDONOUGH OFFICE, RIGHT, THAT'S TYPICALLY WHAT --

A. YES, MA'AM.
Q. -- IT CAN BE REFERRED TO?
A. MM-HUM.
Q. HOW DID YOU HEAR ABOUT AN OPENING THERE?
A. THE DENTAL POST. IT'S A JOB SITE FOR DENTISTS, PEOPLE WHO'S IN DENTISTRY, AND THEY HAD AN AD ON THE DENTAL POST.
Q. AND WHAT DID YOU DO?
A. I SENT MY RESUMÉ OVER.
Q. AND SOMEBODY CONTACTED YOU?
A. YES, MA'AM.
Q. WHO CONTACTED YOU?
A. MS. JENNIFER FLAGGS.
Q. DID SHE INVITE YOU FOR AN INTERVIEW?
A. YES, SHE DID.
Q. AND YOU MET WITH MS. FLAGGS; RIGHT?
A. YES, MA'AM, I SURE DID.
Q. AND YOU WERE HIRED?
A. YES, I WAS.
Q. WHAT WAS YOUR JOB TITLE AT THE MCDONOUGH OFFICE?
A. AT THE MCDONOUGH OFFICE I WAS THE CHECK-IN AND CHECK-OUT PERSON.
Q. EXPLAIN A LITTLE BIT ABOUT WHAT THE JOB DUTIES WOULD BE FOR THE CHECK-IN PROCESS AND THEN THE CHECK-OUT PROCESS?
A. WELL, AS YOU WOULD CHECK IN A PATIENT, YOU WOULD GIVE THEM NEW PATIENT INFORMATION AS -- UPON CHECKING IN. YOU WOULD MAKE

COPIES OF THEIR INSURANCE CARD AND THEIR I.D. YOU WOULD ALSO -- YOU WOULD ALSO ENTER THEIR INFORMATION INTO THE SYSTEM.

Q. AND THAT'S YOUR CHECK-IN DUTIES, WHAT ABOUT CHECK-OUT DUTIES?

A. CHECK-OUT DUTIES YOU WOULD COLLECT CO-PAYS, GO OVER THE PATIENT WITH THEIR TREATMENT PLANS, LET THEM KNOW WHAT THEIR DEDUCTIBLE IS, HOW MUCH THE NEXT VISIT IS GOING TO COST, AND REVIEW THE DOCTOR'S TREATMENT PLAN JUST SO YOU WOULD KNOW THE NEXT APPOINTMENT, BECAUSE YOU HAVE TO CONFIRM APPOINTMENTS AND SCHEDULE APPOINTMENTS.

Q. WHAT KIND OF SERVICES DID THE MCDONOUGH OFFICE OFFER TO PATIENTS?

A. THEY -- AT THE MCDONOUGH OFFICE, BRIDGES, CROWNS, FILLINGS, DENTURES, BROKEN TOOTH, EXTRACTIONS.

Q. WHAT ABOUT JUST GENERAL DENTISTRY?

A. THAT'S GENERAL, YES, MA'AM.

Q. OKAY. AND I'M NOT -- I'M NOT SUPER FAMILIAR WITH DENTURES OR BRIDGES. WHAT DID THE MCDONOUGH OFFICE DO FOR THOSE PATIENTS?

A. TYPICALLY IF THEY NEED TEETH TO COME OUT OF THEIR MOUTH AND THEY NEEDED TO REPLACE THEM WITH SOMETHING ELSE, THEY WOULD DO IMPRESSIONS TO GET THEM A NEW SET OF TEETH IN THEIR MOUTH.

Q. WAS THERE A LAB THERE IN THE OFFICE THAT DID THAT?

A. YES, MA'AM, IT'S A LAB.

Q. WHEN YOU WORKED AT THE MCDONOUGH OFFICE WHO WAS YOUR DIRECT

SUPERVISOR?
A. JENNIFER, MS. JENNIFER FLAGGS.
Q. AND WHO OWNED THE MCDONOUGH OFFICE?
A. DR. HENSON.
Q. AND YOU UNDERSTOOD THAT MS. FLAGGS WAS DR. HENSON'S DAUGHTER; CORRECT?
A. YES, MA'AM, CORRECT.
Q. DID DR. HENSON WORK AT THE MCDONOUGH OFFICE?
A. YES, MA'AM, HE DID.
Q. HOW OFTEN DID YOU SEE HIM?
A. DAILY.
Q. WHAT WAS YOUR INTERACTION WITH DR. HENSON LIKE?
A. I REALLY DIDN'T HAVE ANY INTERACTIONS WITH HIM AT THAT TIME BECAUSE HIS ASSISTANTS ALWAYS COME TO THE FRONT TO CHECK OUT FOR PATIENTS, SO NOT VERY MUCH. I WOULDN'T SEE HIM VERY MUCH, JUST IN PASSING.
Q. DID YOU HAVE ANY PROBLEMS WITH DR. HENSON WHEN YOU WERE AT THE MCDONOUGH OFFICE?
A. NO, MA'AM.
Q. WHEN YOU WORKED AT THE MCDONOUGH OFFICE DID DR. HENSON HAVE ANY OTHER OFFICES?
A. YES, MA'AM.
Q. WHAT OTHER OFFICES OR OFFICE OR OFFICES (VERBATIM)?
A. TO MY KNOWLEDGE HE HAD THE ATLANTA OFFICE AND A TUCKER OFFICE.

Q. AND THE ATLANTA OFFICE WAS LOCATED ON CLEVELAND AVENUE?
A. YES, MA'AM.
Q. AND WE CAN CALL THAT THE ATLANTA OFFICE?
A. YES, WE CAN, SURE.
Q. NOW, YOU TOLD US YOU WORKED AT THE FRONT DESK. WHO WAS UP THERE WITH YOU?
A. AT THE MCDONOUGH OFFICE --
Q. YES.
A. -- JENNIFER FLAGGS AND CYNTHIA -- I CAN'T RECALL HER LAST NAME.
Q. AND IN THE MCDONOUGH OFFICE WHAT OTHER TYPES OF EMPLOYEES WORKED THERE?
A. WE HAD THE HYGIENISTS, TWO OR THREE ASSISTANTS THAT WOULD ASSIST THE DOCTORS, TWO DOCTORS AND MAYBE TWO LAB TECHNICIANS AND THE OFFICE MANAGER AND TWO FRONT DESK.
Q. SO LET ME -- LET ME MAKE SURE I GOT THIS RIGHT. SO YOU HAD THE FRONT DESK EMPLOYEES; CORRECT?
A. YES, MA'AM, CORRECT.
Q. AND THERE WERE THREE OF YOU?
A. YES, CORRECT, YES, MA'AM.
Q. AND THEN THERE WERE TWO TO THREE DENTAL ASSISTANTS?
A. YES, MA'AM, IT WAS.
Q. TWO TO THREE HYGIENISTS?
A. NO, IT WAS ONE. HE HAD ONE HYGIENIST.
Q. OKAY. ONE HYGIENIST?

A. MM-HUM.
Q. AND THEN I THINK I WROTE IT -- MIXED THEM UP. AND TWO LAB TECHNICIANS?
A. CORRECT.
Q. AND THEN THERE WERE THE DENTISTS?
A. YES, MA'AM.
Q. DO YOU RECALL HOW MANY DENTISTS WORKED AT THE MCDONOUGH OFFICE?
A. TWO THREE. I MEAN, HE WOULD BE INCLUDING ONE OF THEM.
Q. I'M SORRY. THAT'S INCLUDING DR. HENSON?
A. RIGHT.
Q. NOW, AT THE FRONT DESK DID YOU PERFORM ANY WORK ON A COMPUTER?
A. YES, MA'AM.
Q. TELL ME WHAT KIND OF COMPUTER SYSTEM WAS AT THE MCDONOUGH OFFICE?
A. IT'S CALLED ACUTEM (PHONETIC) SOFTWARE. IT'S KIND OF AN OLDER SYSTEM, BUT THAT'S THE NAME OF IT, ACUTEM.
Q. WAS THERE AN E-MAIL SYSTEM? DID YOU HAVE A WORK E-MAIL YOURSELF?
A. NO, WE HAD NO PERSONAL E-MAILS, NO, MA'AM.
Q. WAS THERE AN E-MAIL FOR --
A. FOR THE OFFICE, YES.
Q. SO IT WAS A GENERAL E-MAIL FOR THE OFFICE?
A. YES. IT WAS A GENERAL E-MAIL. NO ONE HAD A PERSONAL -- I

MEAN, NOT TO BE USED ON THE JOB.
Q. AND COULD YOU CHECK THE GENERAL E-MAIL?
A. YES, MA'AM, YOU COULD.
Q. NOW, WHEN YOU WERE AT THE MCDONOUGH OFFICE COULD YOU LOG IN TO THE ATLANTA OFFICE?
A. YES, MA'AM, YOU COULD.
Q. WHEN YOU WERE CHECKING OUT A PATIENT AT THE MCDONOUGH OFFICE COULD THEY TELL YOU THAT THEY WOULD RATHER HAVE THEIR NEXT APPOINTMENT AT THE ATLANTA OFFICE?
A. YES, MA'AM.
Q. FROM THE MCDONOUGH OFFICE COULD YOU SCHEDULE A PATIENT TO AN APPOINTMENT IN THE ATLANTA OFFICE?
A. YES, MA'AM.
Q. AND HOW WOULD YOU DO THAT?
A. YOU WOULD JUST LOG IN TO ATLANTA'S LOG-IN.
Q. FROM THE MCDONOUGH OFFICE?
A. FROM MCDONOUGH, YES, MA'AM.
Q. THEN HOW WOULD THE PATIENTS' RECORDS GET TO THE ATLANTA OFFICE?
A. BY MR. FLAGGS. MOSTLY HE DID A LOT OF RUNNING BACK AND FORTH BETWEEN THE OFFICES.
Q. AND TELL US WHO MR. FLAGGS IS.
A. MR. WILLIAM FLAGGS IS THE OFFICE MANAGER OF ATLANTA.
Q. AND YOU UNDERSTOOD HE WAS THE SON-IN-LAW?
A. AND THE SON-IN-LAW OF DR. HENSON.

Q. SO THERE WERE ACTUAL HARD COPIES OF RECORDS?
A. YES, WE HAD CHARTS, PATIENT CHARTS, SO, YES, IT WAS HARD COPIES.
Q. AND THEY COULD GO FROM ONE OFFICE TO THE OTHER?
A. YES, MA'AM.
Q. AND I GUESS IN THOSE CHARTS THERE WERE X-RAYS?
A. X-RAYS, THE DOCTOR WRITE-UPS, TREATMENT PLANS, PATIENT I.D., INSURANCE VERIFICATION, PATIENT MEDICAL HISTORY.
Q. IF IT WAS A PATIENT'S FIRST TIME AT THE MCDONOUGH OFFICE AND THEY HAD TYPICALLY GONE TO THE ATLANTA OFFICE, COULD YOU PULL UP THEIR INSURANCE INFORMATION?
A. YES, MA'AM, I COULD.
Q. HOW WOULD YOU DO THAT?
A. JUST LOG IN TO THE ATLANTA'S PORTAL, INTO THEIR SOFTWARE. IT'S THE SAME.
Q. IT WAS THE SAME SOFTWARE?
A. YES, MA'AM, JUST A DIFFERENT LOG-IN.
Q. BUT EMPLOYEES AT ONE OFFICE HAD PERMISSION TO LOG IN TO THE COMPUTER SYSTEM AT THE OTHER OFFICE?
A. YES, MA'AM, YES, MA'AM.
Q. WHEN YOU WERE AT THE MCDONOUGH OFFICE DID ANY EMPLOYEES GO TO THE ATLANTA OFFICE?
A. YES, MA'AM, WE WOULD ALL GO BACK AND FORTH. IF WE WERE NEEDED, WE WOULD GO BACK AND FORTH, YES.
Q. OKAY. WHO WOULD GO BACK AND FORTH?

A. THE ASSISTANTS. TYPICALLY THE ASSISTANTS THAT WORKED SIDE BY SIDE DR. HENSON, IF HE NEEDED THEM AT THE ATLANTA OFFICE, THEY WOULD GO THERE. OR IF SOMEONE WAS SICK AT THE ATLANTA OFFICE, WE WOULD GO THERE, THE FRONT DESK.
Q. AND I'M A LITTLE CONFUSED BETWEEN THE DENTAL ASSISTANTS AND THE HYGIENISTS. WHAT DOES THE DENTAL ASSISTANT DO?
A. DENTAL ASSISTANTS ARE HANDS-ON MOSTLY WITH THE DENTIST. THE HYGIENISTS AREN'T. THE DOCTOR COMES IN AND CHECKS BEHIND THEIR X-RAYS AND THEY (VERBATIM) TREATMENT PLAN WITH THEM. THE ASSISTANT IS THE ONE THAT HANDS THE DOCTOR EVERYTHING DURING THE PROCEDURE. LIKE, IF HE'S DOING A BRIDGE, THEY'RE IN THERE WITH HIM DOING THAT BRIDGE AND TAKING MODELS OF THAT BRIDGE.
Q. SO DENTAL ASSISTANTS THAT WERE EMPLOYED AT THE MCDONOUGH OFFICE YOU KNEW WOULD GO OVER TO THE ATLANTA OFFICE?
A. OH, YES, MA'AM.
Q. WHAT ABOUT SUPPLIES, DID SUPPLIES EVER GO BACK AND FORTH BETWEEN THE OFFICES?
A. YES, MA'AM.
Q. GIVE ME SOME EXAMPLES.
A. IF ATLANTA NEED (VERBATIM) CHARTS, X-RAY FILMS, ANYTHING OF THAT NATURE, WILL WOULD TAKE THEM BACK AND FORTH.
Q. WILL BEING MR. FLAGGS?
A. WILL BEING MR. FLAGGS, THE OFFICE MANAGER AND SON-IN-LAW OF DR. HENSON.
Q. WHAT TYPE OF FORMS WOULD A NEW PATIENT FILL OUT AT THE

MCDONOUGH OFFICE?
A. NEW PATIENT FORMS? JUST THE NEW PATIENT -- IT'S A NEW PATIENT FORM JUST GIVING INFORMATION OF WHERE THE PATIENT LIVES, THEIR SOCIAL SECURITY BECAUSE YOU HAVE TO DO INSURANCE INFORMATION WITH THAT, THEIR MEDICAL HISTORY, AND THEY HAVE TO DO PRIVACY RIGHTS CONSENT FORM TO GIVE THE DOCTOR CONSENT TO TREAT THEM AND SIGN IT OFF.
Q. TO YOUR KNOWLEDGE WERE THE NEW PATIENT FORMS AND THE PRIVACY RIGHT CONSENT FORMS AND OTHER FORMS THAT WERE GIVEN TO THE PATIENT THE SAME AT THE MCDONOUGH OFFICE AND THE ATLANTA OFFICE?
A. EXACTLY THE SAME.
Q. SO IF A PATIENT WHO TYPICALLY WENT TO THE ATLANTA OFFICE CAME TO THE MCDONOUGH OFFICE, YOU COULD GET THEIR FORMS, THEY WOULDN'T HAVE TO FILL OUT NEW FORMS?
A. NO, MA'AM.
Q. HOW LONG DID YOU WORK AT THE MCDONOUGH LOCATION?
A. ROUGHLY TWO YEARS.
Q. AND WHAT HAPPENED AT THE END OF TWO YEARS? WHAT DID YOU DO?
A. NOTHING REALLY HAPPENED. I WAS JUST OFFERED A JOB AT THE ATLANTA OFFICE, WHICH I THOUGHT THAT WAS A GOOD OPPORTUNITY BECAUSE IT WAS CLOSER TO MY HOME.
Q. WHEN YOU WERE AT THE MCDONOUGH OFFICE WERE YOU EVER WRITTEN UP?

A. NO, MA'AM.
Q. WERE YOU EVER SUSPENDED?
A. NO, MA'AM.
Q. WHEN YOU TRANSFERRED TO THE ATLANTA OFFICE, WHAT POSITION DID YOU HOLD?
A. I HELD THE CHECK -- THE CHECK-OUT. I WAS STRICTLY CHECK-OUT AT THAT TIME.
Q. SO AT THIS TIME YOU ONLY DID THE CHECK-OUT, NOT THE CHECK-IN?
A. CORRECT.
Q. WAS THERE ANY LAG TIME BETWEEN WHEN YOU WORKED AT THE ATLANTA OFFICE AND THE MCDONOUGH OFFICE?
A. NO, MA'AM.
Q. WHO DID YOU REPORT TO AT THE ATLANTA OFFICE?
A. I REPORTED TO MR. WILLIAM FLAGGS, OFFICE MANAGER.
Q. WHEN YOU TRANSFERRED TO THE ATLANTA OFFICE DID YOU HAVE TO FILL OUT ANY NEW-HIRE PAPERWORK, NEW TAX FORMS?
A. NO, MA'AM, JUST THE PROFILE OF WHO I AM, NO NEW PATIENT -- I MEAN, I'M SORRY, NO NEW EMPLOYEE RECORDS.
Q. WHAT KIND OF SERVICES DID THE ATLANTA OFFICE OFFER TO PATIENTS?
A. ATLANTA WAS GENERAL, THE SAME AS MCDONOUGH. WE DID THE DENTURES, THE BRIDGE, THE CROWNS, FILLINGS, EXTRACTIONS, THE SAME SERVICE.
Q. WHAT TYPE OF EMPLOYEES WORKED AT THE ATLANTA OFFICE WHEN

YOU WERE THERE?
A. MEANING THE POSITION?
Q. YES.
A. WE HAD ONE HYGIENIST, TWO FRONT DESK, WHICH WAS MYSELF AND TRACY.
Q. WHAT IS TRACY'S LAST NAME?
A. LOVELACE, THAT I KNOW -- I -- IT WAS LOVELACE, TRACY LOVELACE. MR. WILLIAM FLAGGS, FRONT DESK. WE HAD MAYBE -- YES, WE HAD THREE ASSISTANTS AND IT WAS THREE DOCTORS AND TWO LAB TECHNICIANS AND A GROUNDSKEEPER.
Q. WHO WAS THE GROUNDSKEEPER? DO YOU KNOW?
A. WE CALL HIM J.J.
Q. OKAY. NOW, YOU TOLD ME THAT YOU WERE ASSIGNED TO THE CHECK-OUT, BUT TELL ME WHAT THE CHECK-OUT DUTIES WERE. WERE THEY THE SAME AS THEY WERE IN MCDONOUGH?
A. NO, MA'AM, THEY'RE NOT THE SAME. YOUR CHECK-OUT IS YOU ARE GOING OVER TREATMENT PLANS WITH PATIENTS, LETTING THEM KNOW WHAT THEIR NEXT APPOINTMENT WILL BE AND WHEN IT WILL BE. YOU COLLECT CO-PAYS AND THEIR DEDUCTIBLES, SO IT'S A LITTLE DIFFERENT THAN CHECK-IN.
Q. OKAY. I THINK I CONFUSED YOU A LITTLE. SO THE CHECK-OUT DUTIES YOU WERE SAYING WERE DIFFERENT FROM THE CHECK-IN DUTIES?
A. YES.
Q. OKAY. WHEN YOU TRANSFERRED TO THE ATLANTA OFFICE DID YOU EVER HAVE TO GET TRAINED ON ANY NEW SOFTWARE?

A. NO, MA'AM. I ALREADY KNEW EVERYTHING.
Q. AND WHEN YOU WERE IN THE ATLANTA OFFICE COULD YOU LOG IN TO THE MCDONOUGH OFFICE COMPUTER?
A. YES, MA'AM, YOU COULD.
Q. AND HOW WOULD YOU DO THAT?
A. YOU WOULD JUST USE A DIFFERENT -- THE USER NAME FOR MCDONOUGH -- I MEAN FOR THE ATLANTA OFFICE AND THE PASSWORD.
Q. WHEN YOU WERE CHECKING OUT A PATIENT IN THE ATLANTA OFFICE COULD THEY TELL YOU THEY WOULD RATHER HAVE THEIR NEXT APPOINTMENT AT THE MCDONOUGH OFFICE?
A. WELL, IF THEY WERE -- IF THEY NEEDED TO, YES, THEY COULD.
Q. AND COULD YOU FROM THE ATLANTA OFFICE LOG IN TO THE MCDONOUGH OFFICE AND SCHEDULE AN APPOINTMENT?
A. YES, MA'AM, YOU COULD.
Q. WHEN YOU WERE AT THE ATLANTA OFFICE DID YOU EVER SEE ANY EMPLOYEES FROM THE ATLANTA OFFICE GO OVER TO THE MCDONOUGH OFFICE FOR ANY REASON?
A. SEVERAL TIMES.
Q. WHO DID YOU SEE DO THAT?
A. SHUNTANA -- HER NAME IS ANNA -- ANNIE MAE (PHONETIC), ONELLA (PHONETIC) HARRIS, AND I HAVE MYSELF. I HAVE WENT, LIKE, FOR AT LEAST THREE TIMES MYSELF. IF A FRONT DESK PERSON IS OUT ILL, I WOULD GO DOWN THERE TO THE MCDONOUGH OFFICE.
Q. OKAY. SO WHO WOULD TELL YOU TO GO TO THE MCDONOUGH OFFICE?
A. MR. FLAGGS, WILLIAM FLAGGS.

Q. AND WHEN YOU GOT TO THE MCDONOUGH OFFICE WOULD YOU CLOCK IN?
A. YES, MA'AM.
Q. AND WOULD YOU CLOCK OUT?
A. YES, MA'AM.
Q. AND THEN WOULD THE MCDONOUGH OFFICE PAY YOU?
A. THE MCDONOUGH OFFICE WOULD TRANSLATE -- TRANSLATE IT OVER TO MY OFFICE MANAGER, MR. FLAGGS, AND LET HIM KNOW THE HOURS THAT I WAS THERE.
Q. SO IT WOULD SHOW UP ON YOUR PAYCHECK FROM THE ATLANTA OFFICE?
A. FROM THE MCDONOUGH OFFICE. OH, YES, YES, CORRECT, YES, MA'AM.
Q. SO WHEN YOU WORKED AT THE ATLANTA OFFICE AND WENT TO THE MCDONOUGH OFFICE TO FILL IN, THE MCDONOUGH OFFICE DIDN'T PAY YOU?
A. THE ATLANTA OFFICE. MY HOURS WOULD SHOW UP ON MY NORMAL PAY STUB.
Q. AND EARLIER YOU SAID OTHER EMPLOYEES WENT BACK AND FORTH AND YOU SAID SHUNTANA AND --
A. ONELLA HARRIS.
Q. WELL, LET'S STOP WITH SHUNTANA. DO YOU REMEMBER WHAT HER JOB TITLE WAS?
A. SHE WAS DR. HENSON'S ASSISTANT.
Q. OKAY. AND YOU SAID ONELLA HARRIS. DO YOU REMEMBER WHAT

HER JOB WAS?
A. SHE WAS ALSO DR. HENSON'S ASSISTANT.
Q. AND THEN YOU SAID ANNIE MAE?
A. WELL, SHE'S -- THAT'S SHUNTANA.
Q. THAT'S SHUNTANA. OKAY.
A. YES, MA'AM, YES.
Q. EARLIER YOU TOLD US THAT SUPPLIES WENT FROM THE MCDONOUGH OFFICE TO THE ATLANTA OFFICE. DID THE SAME THING HAPPEN FROM THE ATLANTA OFFICE TO THE MCDONOUGH OFFICE?
A. YES, MA'AM.
Q. DID BOTH OF THE OFFICES ACCEPT THE SAME INSURANCE FROM PATIENTS?
A. YES, MA'AM.
Q. FROM THE ATLANTA OFFICE COULD YOU LOG IN TO THE MCDONOUGH OFFICE TO CHECK INSURANCE FOR A PATIENT?
A. YES, MA'AM. WE USED THE SAME M.P.I., WHICH IS THE DOCTOR'S NATIONAL PROVIDER I.D. AND TAX I.D.
Q. AND WHAT DOES THAT MEAN?
A. THAT'S WHEN YOU'RE DOING INSURANCE FOR BOTH OFFICES, THEY USE THE SAME INFORMATION TO GET IT VERIFIED.
Q. WHEN YOU FIRST STARTED AT THE FRONT DESK, WHO WAS THERE WITH YOU?
A. AT ATLANTA OFFICE?
Q. IN THE ATLANTA OFFICE.
A. TRACY LOVELACE.

Q. AND I NOTICE IN SOME OF THE DOCUMENTS IT HAS TRACY LOVELACE KENNEDY. DOES THAT -- DO YOU KNOW WHY -- DID SHE GET MARRIED?
A. BEFORE I LEFT SHE WAS ENGAGED, SO I'M ASSUMING SHE'S MARRIED NOW, YES, MA'AM.
Q. OKAY. SO EITHER TRACY LOVELACE, TRACY KENNEDY. AND WHAT WAS HER JOB?
A. TRACY'S JOB WAS TO CHECK IN PATIENTS, TO GIVE THEM THE NEW PATIENT FORMS TO FILL OUT, TO COPY THEIR I.D. AND THEIR INSURANCE INFORMATION AND TO ENTER THAT INTO THE SYSTEM AS WELL.
Q. WHILE YOU WORKED AT THE FRONT DESK, WAS ANYONE ELSE HIRED?
A. I DON'T RECALL. I KNOW SOME INTERNS, STUDENTS WERE COMING IN.
Q. DO YOU KNOW WHO APRIL JENNINGS IS?
A. YES.
Q. WAS SHE HIRED TO WORK AT THE FRONT DESK?
A. WHEN I WAS -- WHEN I WAS STILL THERE, APRIL WAS A INTERN. SO I'M THINKING SHE WAS HIRED, BUT I -- IT WAS KIND OF CONFUSING BECAUSE SHE WAS AN INTERN, AND I DON'T KNOW FOR SURE IF THEY HIRED HER ON.
Q. BUT SHE WAS THERE AT SOME POINT AFTER?
A. YES, SHE WAS.
Q. AND THEN DO YOU KNOW WHO MISTY WRIGHT IS?
A. SHE WAS ANOTHER INTERN.
Q. AND SHE CAME IN AFTER YOU HAD ALREADY BEEN THERE; CORRECT?
A. YES, MA'AM, THAT'S CORRECT.

Q. MS. POLLARD, DID DR. HENSON WORK AT THE ATLANTA OFFICE?
A. YES, HE DID.
Q. TELL ME WHEN YOU FIRST STARTED WORKING AT THE ATLANTA OFFICE, WHAT WAS YOUR EXPERIENCE WITH DR. HENSON?
A. DR. HENSON, HE WORKED THERE, BUT, OF COURSE, HE WAS MOSTLY IN THE MCDONOUGH OFFICE. SO HE WAS BARELY THERE, BUT TO ANSWER YOUR QUESTION, HE WAS -- HE DID WORK THERE. HE JUST BARELY WORKED THERE WHEN I FIRST GOT THERE. HE WAS MOSTLY AT THE MCDONOUGH OFFICE, BUT STARTING OUT IT WAS -- I MEAN, I WAS JUST DOING MY WORK. I, YOU KNOW, I DIDN'T INTERACT WITH HIM A LOT.
Q. AND DID YOU HAVE ANY INTERACTIONS WITH HIM THAT YOU FELT WERE INAPPROPRIATE?
A. OH, AFTER WORKING THERE FOR A MOMENT, YES, I DID.
Q. OKAY. LET'S TALK ABOUT THE FIRST -- THE FIRST TIME. TELL ME WHAT HAPPENED.
A. THE FIRST TIME I WENT OUT OF TOWN BECAUSE MY MOM NEEDED MY HELP AS FAR AS MY BROTHER. HE WAS SICK. HE HAS BIPOLAR. AND WHEN I RETURNED BACK TO WORK, DR. HENSON ASKED WILL TO HAVE ME COME IN THE OFFICE TO TALK.
Q. THAT'S MR. FLAGGS?
A. YES.
Q. OKAY.
A. MR. FLAGGS TO HAVE ME TO COME IN THE OFFICE AND TALK TO HIM. AND WHEN I WENT IN, HE WAS ASKING ME ABOUT MY BROTHER. AND I TOLD HIM THE SITUATION, MY BROTHER WAS SICKLY AND I HAD TO

GO HELP MY MOM. WELL, HE TOLD ME THAT HE UNDERSTOOD. I THINK HE HAVE A SON OR A RELATIVE THAT HAS THE SAME SITUATION. WELL, AFTER THIS CONVERSATION WENT ON, HE STARTED ASKING ME, LIKE, HOW DO I SATISFY MYSELF AND AM I HAVING SEX.
Q. WELL, LET ME STOP YOU THERE. WHEN HE ASKED YOU, ARE YOU HAVING SEX, WHAT DID YOU SAY?
A. I JUST WAS KIND OF PUZZLED, LIKE, WHY IS HE ASKING ME ABOUT SEX AFTER THE -- IT'S KIND OF CRAZY BECAUSE IT WENT FROM ONE CONVERSATION TO ANOTHER ALL OF A SUDDEN. AND I HAVE NO CLUE OF WHY HE ASKED ME THAT. I JUST WAS KIND OF PUZZLED.
Q. AND THEN YOU SAID HE ASKED YOU WHAT YOU WERE USING FOR SEXUAL PLEASURE?
A. AND AFTER I TOLD HIM THAT I -- I TOLD HIM I WASN'T HAVING SEX BECAUSE I WANT TO THROW HIM OFF, BUT I WAS, LIKE, NO, I'M NOT HAVING SEX. AND WHY ARE YOU ASKING ME THAT? AND HE SAID, WELL, WHAT DO YOU DO FOR SEXUAL PLEASURE?
Q. AND WHAT DID YOU DO?
A. I JUST LEFT OUT OF THE OFFICE AT THAT TIME BECAUSE I JUST COULDN'T BELIEVE HE WOULD EVEN ASK ME SOMETHING LIKE THAT.
Q. DID YOU GO BACK TO YOUR DESK?
A. YES, MA'AM, I SURE DID.
Q. DID YOU TELL ANYONE WHAT DR. HENSON HAD SAID?
A. WHEN I WENT BACK TO MY DESK I TOLD MR. FLAGGS THAT DR. HENSON SAID INAPPROPRIATE THINGS TO ME. AND I TOLD HIM EXACTLY WHAT HE SAID AND HE WAS -- HE WAS, LIKE, WHY -- WHY

WOULD HE EVEN SAY SOMETHING LIKE THAT TO YOU? AND HE GOT UP OUT OF MY DESK BECAUSE HE WAS SITTING AT MY DESK, MR. FLAGGS WAS.
Q. WAS HE PERFORMING YOUR DUTIES?
A. YES, MA'AM.
Q. AND SO THEN WHEN YOU SAT BACK DOWN, WHAT WERE YOU THINKING?
A. I WAS JUST, LIKE, WHY -- I KNEW HIS REPUTATION WAS, YOU KNOW, THAT HE MESSED WITH OTHER EMPLOYEES, BUT I JUST --
MR. VILLINES: OBJECTION. HEARSAY.
THE COURT: LET'S STOP. WHY DON'T YOU -- I THINK THE QUESTION WAS WHEN YOU SAT BACK DOWN, WHAT WERE YOU THINKING, SO KEEP YOUR ANSWERS DIRECTLY TO THE QUESTIONS THAT ARE BEING ASKED.
THE WITNESS: OKAY. WHEN I SAT DOWN, I JUST -- I WAS CONFUSED TO WHY HE WOULD ASK ME THAT, AND I JUST TRIED TO GET MY MIND BACK TO MY JOB.
BY MS. MARTIN:
Q. WERE THERE ANY OTHER INCIDENTS WITH DR. HENSON?
A. YES, MA'AM.
Q. OKAY. WHEN WAS THE NEXT ONE?
A. THE NEXT INCIDENT WAS MR. FLAGGS CAME IN AND HE ASKED ME TO GO INTO DR. HENSON'S OFFICE. HE SAID DR. HENSON WANTED TO SEE ME. WHEN HE -- HE CALLED ME INTO THE OFFICE, I'M LOOKING, LIKE, WHY DO YOU WANT TO SEE ME. SO I GO INTO THE OFFICE, AND DR. HENSON ASKED ME TO SIT DOWN. SO I SAT DOWN. AND --
Q. WHAT DID DR. HENSON DO?

A. THIS IS -- THIS IS THE TIME THAT WE -- SORRY. I'M JUST GETTING MY THOUGHTS TOGETHER.
Q. THAT'S OKAY.
A. I'M SORRY. COULD YOU REPEAT YOUR QUESTION?
Q. IT'S OKAY. WE'RE GOOD. THERE WAS ANOTHER INCIDENT. YOU HAD TOLD US ABOUT ONE INCIDENT. AND THERE WAS ANOTHER INCIDENT WITH DR. HENSON. YOU HAD SAID THAT WILL TOLD YOU TO GO IN THERE?
A. RIGHT. AND WHEN I WENT INTO DR. HENSON'S OFFICE AND I SAT DOWN, AT THIS TIME HE BROUGHT LUNCH IN.
Q. WHO IS HE?
A. DR. HENSON.
Q. OKAY.
A. HE BROUGHT LUNCH IN FOR US AND HE ASKED WILL TO HAVE ME COME IN AND HAVE LUNCH WITH HIM.
Q. AND WHEN YOU SAY, HE BROUGHT LUNCH IN FOR US, WHO WAS "US"?
A. WELL, WILL GOT HIS LUNCH AND THEN HE ASKED ME TO GO IN AND HAVE MY LUNCH WITH DR. HENSON.
Q. OKAY.
A. AND WHEN I WENT IN WITH DR. HENSON, I SAT AT THE DESK THAT'S, LIKE, RIGHT -- THE FAR RIGHT. HIS DESK -- HE WAS SITTING FACING ME.
Q. HE WAS BEHIND THE DESK?
A. YES, MA'AM. AND WHEN I SAT DOWN, HE GOT HIS FOOD AND SAT RIGHT NEXT TO ME. AND IT'S A CHAIR THAT SITS OVER TO THE SIDE.

HIS DESK IS HERE, HE'S SITTING THERE, I'M SITTING HERE. HIS OTHER CHAIR IS HERE. SO HE PULLS THE CHAIR OVER, AND THE DOOR -- THE OFFICE IS KIND OF SMALL, SO NOW I'M, LIKE, BLOCKED IN. OKAY. AND DR. HENSON, AFTER WE -- WE'RE EATING, WE'RE TALKING, NO (VERBATIM) CONVERSATION, BUT THEN DR. HENSON STARTED CARESSING MY THIGHS. AND NOW I'M FEELING VERY UNCOMFORTABLE. OKAY. AND I STOOD UP. AT THIS MOMENT I STOOD UP.
Q. WHAT DID HE -- WHEN YOU STOOD UP, WHAT --
A. HE WAS ASKING ME WHERE DO I LIVE AND WHEN WILL I BE -- WHEN WILL MY SON BE AT HOME AND THINGS OF THAT NATURE. SO I'M KNOWING THAT HE'S TRYING TO COME ON TO ME NOW SURELY.
Q. OKAY. YOU SAID YOU STOOD UP. WHAT DID DR. HENSON DO?
A. WHEN I STOOD UP, HE'S, LIKE, IT'S NOT LIKE THAT. AND HE STOOD UP. I STOOD UP FIRST AND HE'S SITTING ON THE SIDE OF ME. AND HE -- AFTER HE RUBBED MY LEGS HE WAS, LIKE, IT'S NOT LIKE THAT BECAUSE I WAS ABOUT TO STORM OUT OF THE -- OUT OF HIS OFFICE. BUT HIS CHAIR WAS, LIKE, CLOSED IN WHERE I COULDN'T -- I COULDN'T MOVE HIM. AND WHEN I STOOD UP, HE STOOD UP, AND THEN HE TRIED TO KISS ME IN MY MOUTH.
Q. AND WHAT DID YOU DO?
A. AND I TURNED MY -- I TURNED MY HEAD, LIKE, DON'T KISS ME AND THEN HE PUT HIS HAND IN MY SHIRT.
Q. WHAT WERE YOU WEARING?
A. I HAD LIKE A -- WE WORE -- SOMETHING LIKE I HAVE ON TODAY WITHOUT THIS BLOUSE ON, LIKE A REGULAR BLACK BLOUSE WITH BLACK

SLACKS.
Q. WAS IT A UNIFORM?
A. IT'S NOT A UNIFORM. IT'S JUST REGULAR SLACKS LIKE WHAT I HAVE ON TODAY, JUST REGULAR BLACK UNIFORM LIKE -- NOT A UNIFORM, BUT PROFESSIONAL LOOK.
Q. OKAY. AND SO --
A. YES, MA'AM.
Q. SO WHAT WAS YOUR SHIRT?
A. JUST A REGULAR -- LIKE JUST A REGULAR SHIRT. IT'S KIND OF SHORT SLEEVE.
Q. OKAY.
A. BUT IT'S A PROFESSIONAL, JUST STAYED WITH PROFESSIONAL LOOK AND MAYBE SOME PEARLS OR SOMETHING TO MAKE IT LOOK PROFESSIONAL.
Q. AND YOU SAID HE PUT HIS HAND DOWN YOUR SHIRT?
A. YES. WELL, THIS SHIRT, YOU COULD -- YOU KNOW, WITHOUT THIS SHIRT, YOU COULD PUT YOUR HAND IN MY SHIRT AND THAT'S WHAT HE DID. AND HE PULLED MY BREAST OUT.
Q. SO HIS HAND WENT INSIDE YOUR BRA?
A. YES, MA'AM.
Q. AND TOUCHED YOUR BREAST?
A. YES, MA'AM.
Q. WHAT DID YOU DO?
A. I STORMED OUT OF HIS OFFICE AND WENT STRAIGHT TO MY OFFICE MANAGER WILL AND TOLD WILL THAT HE IS TOUCHING ME. I TOLD MY OFFICE MANAGER THAT HE IS TOUCHING ME.

Q. AND LET ME ASK YOU. WHERE WAS MR. FLAGGS?
A. HE WAS -- MR. FLAGGS IS THE ONE THAT CAME AND TOLD ME THAT DR. HENSON WANTED TO HAVE LUNCH WITH ME AND ASKED ME TO GO IN AND HE'LL COVER FOR ME. SO HE WAS SITTING AT THE DESK.
Q. SO WHEN YOU WENT TO THE DESK, TELL ME WHAT YOU SAID TO MR. FLAGGS.
A. I TOLD HIM THAT DR. HENSON WAS ONCE AGAIN SAYING LITTLE THINGS TO ME THAT'S INAPPROPRIATE. AND THIS TIME HE TOUCHED ME. AND I TOLD WILL. AND HE SAID, WOW, I'LL TALK TO HIM ABOUT IT, I'LL TALK TO HIM.
Q. WHAT DID YOU DO?
A. I WAS REALLY JUST DISTRAUGHT. AND TRACY LOVELACE, SHE WAS SITTING AT THE FRONT, AND SHE HEARD ME TELL MR. FLAGGS. AND SHE SAID TO ME, SHE SAID, DON'T LET HIM TOUCH YOU LIKE THE OTHER GIRLS HERE BECAUSE THEY WORK HERE BECAUSE THEY LET HIM TOUCH THEM.
Q. HOW WERE YOU PHYSICALLY FEELING AT THE MOMENT?
A. I WAS -- I JUST NEVER HAVE BEEN TOUCHED BY SOMEBODY I DON'T WANT TO TOUCH ME OR AN EMPLOYER, EXCUSE ME, BECAUSE I GET EMOTIONAL TALKING ABOUT THIS. BUT I'VE NEVER BEEN TOUCHED WITHOUT WANTING TO BE TOUCHED, SO I JUST FELT REALLY BAD BECAUSE -- THANK YOU. I'M SORRY. BUT I JUST FELT REALLY BAD AND NASTY BECAUSE I WAS REALLY HOT BECAUSE I WAS IN THE OFFICE WITH HIM AND WHEN HE WAS TOUCHING ME I FELT REALLY, YOU KNOW, FRUSTRATED LIKE I WANT TO FIGHT. BUT I'M NOT A VIOLENT PERSON,

YOU KNOW.
Q. I THINK THERE'S WATER NEXT TO YOU. DO YOU WANT SOME WATER?
A. I'LL BE OKAY.
Q. DID ANYTHING ELSE HAPPEN THAT DAY?
A. YES, MA'AM. WILL -- AFTER I TOLD MR. FLAGGS THAT HE HAD TOUCHED ME THIS TIME, HE TOLD ME I CAN GO HOME. HE TOLD ME I CAN GO HOME EARLIER BECAUSE I -- BEING THE CHECK-OUT PERSON, I HAVE TO BE PRETTY MUCH THE LAST PERSON THERE. I'M SORRY.
Q. THAT'S OKAY.
A. I'M OKAY. BUT PRETTY MUCH BEING THE CHECK-OUT PERSON, YOU HAVE TO BE THE LAST PERSON THERE. AND HE KNEW THAT I WOULD BE THE LAST ONE THERE. AND MR. FLAGGS LET ME GO HOME. HE SAID, YOU CAN GO HOME EARLY TODAY.
Q. AFTER THAT WERE THERE ANY OTHER INCIDENTS WITH DR. HENSON?
A. YES, MA'AM. LIKE I WAS SAYING, I WAS TRYING TO HELP MY MOM OUT WITH MY BROTHER'S SITUATION, AND SHE NEEDED TO MOVE HERE. SO I DID ASK FOR A PAY-DAY ADVANCEMENT SO THAT I CAN HELP GET HER HERE. AND SO MR. WILLIAM FLAGGS TOLD ME I HAD TO GET IT APPROVED. HE SAID, SURE, YOU KNOW, YOU'VE BEEN HERE, SO -- BUT WE NEED TO GET IT APPROVED BY DR. HENSON. SO MR. FLAGGS SAID WHEN DR. HENSON COMES UP, I'LL LET YOU GO IN THE OFFICE AND YOU CAN TALK TO HIM ABOUT THE APPROVAL. SO WHEN DR. HENSON DID FINALLY COME UP TO THE ATLANTA OFFICE, I WENT -- MR. FLAGGS CAME OUT. HE SAID, YOU CAN GO IN AND GO AHEAD AND TALK TO DR. HENSON. SO WHEN I WENT IN TO TALK TO HIM ABOUT IT, THE

ADVANCEMENT THAT I NEEDED, HE SAID, YEAH, I'LL APPROVE IT, BUT WE NEED TO TALK ABOUT HOW YOU'RE GOING TO PAY ME BACK. AND I SAID, PAY YOU BACK, WHAT DO YOU MEAN? HE WAS, LIKE, WELL, YOU CAN PAY ME SEXUAL FAVORS. HE WAS, LIKE, I COULD COME OVER TO YOUR HOUSE. AND HE WAS, LIKE, CAN YOU GIVE ME, YOU KNOW, THE ADDRESS WHERE YOU LIVE. AND I WAS, LIKE, NO, I'M NOT GIVING YOU MY ADDRESS. AND HE WAS, LIKE, WELL, WE CAN DISCUSS IT LATER. SO AT THAT TIME I DID GO OUT TO WILL AND I TOLD -- MR. FLAGGS, AND I TOLD HIM THAT HE DID SAY YES BUT HE SAID SEXUAL FAVORS I COULD PAY BACK. AND WHEN I TOLD HIM THAT HE WAS, LIKE, I DON'T KNOW WHAT TO SAY ABOUT HIM.

Q. WERE THERE ANY OTHER INCIDENTS WITH DR. HENSON?

A. YES, MA'AM.

Q. WHEN WAS THE NEXT ONE?

A. THE NEXT ONE WAS WHEN ONCE AGAIN MR. FLAGGS -- I DON'T KNOW IF THEY WERE GOING -- I DON'T KNOW IF THEY WERE DOING THIS TOGETHER. AT THIS POINT I'M THINKING THAT IS THIS SOMETHING THEY'RE DOING TOGETHER, BECAUSE HE KEEPS COMING TO GET ME FOR HIM. SO HE SAID IS MR. -- HE SAID DR. HENSON WANTS TO SEE YOU IN THE OFFICE. SO I GO INTO THE OFFICE LIKE MR. FLAGGS ASKED ME TO GO IN. I SAID, NO, I'M NOT GOING IN. HE WAS, LIKE, YOU'LL BE OKAY. I'M RIGHT HERE. YOU'LL BE JUST FINE. SO I GO INTO THE OFFICE. I'M STANDING NOW BECAUSE I'M NOT GOING TO SIT DOWN BECAUSE EVERY TIME I SIT DOWN, IT'S SOMETHING ELSE COMES UP. SO I'M STANDING UP. SO HE ASKED ME TO HAVE A SEAT. THAT'S THE

APPROPRIATE THING. I'M NOT GOING TO SIT DOWN UNLESS HE ASKS ME TO SIT DOWN. HE ASKED ME TO SIT DOWN, I'M NOT GOING TO SIT DOWN. SO HE STANDS UP AND WALKS TOWARDS ME. THE DOOR IS ALWAYS CLOSED. HE WOULD ALWAYS CLOSE HIS DOOR. WHEN YOU COME IN, HE'S GOING TO SAY, CLOSE THE DOOR. AND WHEN I WENT IN AND HE STOOD UP AT THIS TIME BECAUSE I REFUSED TO SIT DOWN. AND HE WALKS OVER TOWARDS ME AND HE STARTED TRYING TO KISS ME IN MY MOUTH. AND I TOLD HIM, I'M NOT GOING TO KISS YOU. I'M NOT GOING TO KISS YOU. I'M A CHRISTIAN. I DON'T GO AROUND KISSING MEN AND MY EMPLOYERS. SO AT THIS TIME HE PUT HIS HAND DOWN IN MY PANTS AND STARTED FONDLING WITH MY BREAST. I RAN OUT OF THE OFFICE THIS TIME COMPLAINING TO MR. FLAGGS, THE ONE WHO SAID HE WOULD TAKE CARE OF IT, AND I COMPLAINED TO HIM AND TOLD HIM THAT -- AND BEFORE I LEFT OUT, WHEN HE TOUCHED ME, I GRABBED HIM, I GRABBED HIS HAND. I SAID DON'T YOU EVER TOUCH ME, DON'T YOU EVER PUT YOUR HANDS ON ME. IN MY MIND IT'S, LIKE, WHAT DID YOU JUST DO? YOU'RE GOING TO BE FIRED.

Q. LET ME STOP YOU RIGHT THERE. DO YOU RECALL WHEN THIS INCIDENT OCCURRED?

A. THIS WAS -- IT WAS IN SEPTEMBER.

Q. 2012?

A. OF 2012. I DO RECALL.

Q. OKAY. AND YOU WERE TELLING US THAT BOTH OF YOU WERE STANDING?

A. YES, MA'AM. I REFUSED TO SIT DOWN, SO HE STOOD UP THIS

TIME.
Q. AND I THINK YOU SAID THAT HE PUT HIS HAND IN YOUR PANTS?
A. YES, HE DID.
Q. OKAY.
A. IN MY DIRECT -- LIKE, THESE PANTS I GOT ON, YOU CAN MOVE THEM. BECAUSE I DON'T WEAR -- I DON'T WEAR TIGHT CLOTHES.
Q. OKAY.
A. SO HE PULLED MY PANTS AND PUT HIS HANDS IN MY PANTS AND HE TOUCHED --
Q. WAS HIS HAND --
A. -- TOUCHED.
Q. -- INSIDE YOUR UNDERWEAR?
A. YES. YOU CAN GRAB -- HE GRABBED MY UNDERWEAR IN MY -- WITH HIS THUMB AND PUT HIS HANDS IN MY PANTS, LIKE, HIS HAND WAS ON MY VAGINA.
Q. AND YOU SAID HE PUT ONE HAND ON YOUR BREAST?
A. YES, HE -- LIKE, IF YOU'RE STANDING IN SOMEBODY'S FACE AND YOU KIND OF FUMBLING WITH THEM, YOU KNOW, IN BOTH DIRECTIONS. HE WAS MORE AGGRESSIVE AND MORE FORCEFUL THIS TIME.
Q. AND WHAT DID YOU DO WHEN HIS HAND WAS IN YOUR PANTS?
A. I GRABBED HIS HAND OUT OF MY -- I GRABBED HIM BY HIS ARM AND TOLD HIM DON'T EVER TOUCH ME.
Q. AND THEN I THINK YOU SAID THAT AT THAT MOMENT YOU WERE WORRIED YOU WOULD GET TERMINATED?
A. YES.

Q. WHY WERE YOU WORRIED YOU WOULD GET TERMINATED?
A. BECAUSE I DEMANDED HIM TO NEVER TOUCH ME AND I GRABBED HIM, SO...
Q. AND YOU SAID YOU WALKED OUT OF THE OFFICE AND WENT TO WILL. WHAT DID YOU TELL MR. FLAGGS?
A. I TOLD MR. FLAGGS THAT HE TOUCHED -- HE ACTUALLY TOUCHED ME. I TOLD HIM HE PUT HIS HAND DOWN IN MY PANTS AND HE TRIED TO KISS ME IN MY MOUTH.
Q. AND WHAT DID MR. FLAGGS SAY TO YOU?
A. HE SAID HE WAS GOING TO TALK TO HIM ABOUT THE SITUATION BECAUSE IT HAS WENT TOO FAR.
Q. DID YOU GO BACK TO WORK?
A. I DID, BUT MR. FLAGGS TOLD ME I COULD LEAVE BECAUSE HE DIDN'T WANT ME TO STAY LATE AND HE LET ME GO HOME EARLY AGAIN.
Q. AND BUT BEFORE YOU WENT HOME, YOU SAID YOU DID GO BACK TO WORK?
A. OH, YES. I WAS STILL WORKING, BUT I DIDN'T STAY THE WHOLE SHIFT, YES, MA'AM.
Q. WHAT WERE YOU THINKING OR FEELING AT THAT MOMENT?
A. I WAS -- I WAS REALLY -- I WAS REALLY MAD AT THIS MOMENT BECAUSE I'M STILL TRYING TO WORK AND CHECK OUT MY PATIENTS, BUT NOW I'M REALLY UPSET BECAUSE HE ACTUALLY TOUCHED ME AND I FELT REALLY NASTY AND IT WAS JUST -- IT WAS JUST A HORRIBLE DAY FOR ME BECAUSE HE ACTUALLY ACT OUT WHAT HE WAS SAYING AT FIRST, HE TOUCHED ME AND FELT ME.

Q. AND YOU SAID YOU LEFT EARLY. DID YOU RETURN TO WORK?
A. YES, MA'AM.
Q. WHY DID YOU RETURN TO WORK?
A. BECAUSE, I MEAN, I'M A SINGLE MOM. I KNOW IF I WASN'T GOING THROUGH THAT SITUATION, I WOULD PROBABLY STILL BE AT METRO NOW IF I WASN'T BEING, YOU KNOW, TOUCHED ON OR EVEN BOTHERED BECAUSE, FIRST OF ALL, I WORK HARD. I DON'T MESS WITH NOBODY, YOU KNOW.
Q. DID YOU HAVE ANOTHER JOB LINED UP?
A. NOT AT THE TIME, BUT I STARTED LOOKING RIGHT AWAY BECAUSE I KNEW I HAD CROSSED THE LINE. AND I DIDN'T -- YOU KNOW, I WANTED TO BE THERE, BUT AT THIS POINT I -- THIS IS MY BOSS, YOU KNOW, AND I JUST SNAPPED OFF AT HIM FOR TOUCHING ME.
Q. AND WHEN YOU SAID YOU CROSSED THE LINE, WHAT DO YOU MEAN BY THAT?
A. NO. HE CROSSED THE LINE.
Q. I'M SORRY. HE CROSSED THE LINE?
A. HE CROSSED THE LINE.
Q. BEFORE I ASK YOU ANYMORE QUESTIONS ABOUT DR. HENSON, LET ME ASK YOU, WERE YOU EVER GIVEN A POLICY REGARDING SEXUAL HARASSMENT WHEN YOU WORKED AT THE MCDONOUGH OFFICE?
A. NO, MA'AM.
Q. WERE YOU EVER GIVEN A POLICY REGARDING SEXUAL HARASSMENT WHEN YOU WORKED AT THE ATLANTA OFFICE?
A. NO, MA'AM.

Q. ARE YOU AWARE OF WHETHER THERE WAS A SEXUAL HARASSMENT POLICY AT EITHER OFFICE?

A. I WASN'T AWARE.

THE COURT: MS. MARTIN, WE'RE GOING TO HAVE TO TAKE A BREAK RATHER SOON. ARE YOU GOING TO FINISH WITH THIS WITNESS RATHER QUICKLY OR SHOULD WE GO AHEAD AND TAKE A BREAK NOW?

MS. MARTIN: LET'S GO AHEAD AND TAKE A BREAK, YOUR HONOR.

THE COURT: WELL, WE'VE BEEN GOING A WHILE AND I THINK EVERYONE COULD USE A BREAK, SO LET'S TAKE TEN MINUTES, AND WE'LL COME BACK AT 3:30 AND WITH THAT WE ARE IN RECESS UNTIL 3:30. THANK YOU.

(RECESS TAKEN.)

THE COURT: ALL RIGHT. YOU MAY BE SEATED. ANYTHING WE NEED TO TAKE UP, OR ARE WE GOOD TO KEEP GOING?

MS. MARTIN: I'M SORRY, YOUR HONOR?

THE COURT: ANYTHING WE NEED TO TAKE UP, OR ARE WE GOOD TO KEEP GOING?

MS. MARTIN: GOOD TO KEEP GOING.

MR. VILLINES: KEEP GOING, YOUR HONOR.

THE COURT: OKAY. MS. POLLARD, YOU CAN TAKE THE STAND.

AND YOU CAN BRING IN THE JURY.

(JURY PRESENT.)

THE COURT: OKAY. EVERYONE ELSE CAN BE SEATED.

AND YOU CAN CONTINUE, MS. MARTIN.

BY MS. MARTIN:

Q. MS. POLLARD, BEFORE THE BREAK, WE WERE TALKING ABOUT WHETHER OR NOT THERE WAS A SEXUAL HARASSMENT POLICY AT EITHER OF THE OFFICES, AND I THINK YOU TOLD ME NO.

A. NO, THERE WAS NOT.

Q. AT EITHER OFFICE DID ANYONE TELL YOU WHAT TO DO IF YOU FELT LIKE YOU WERE BEING SEXUALLY HARASSED?

A. NO, MA'AM.

Q. DO YOU KNOW IF THERE WAS EVEN A POLICY THAT PROHIBITED SEXUAL HARASSMENT?

A. YES.

Q. THERE WAS A POLICY?

A. NOT AT -- THE OFFICE OR JUST IN GENERAL?

Q. AT THE OFFICE.

A. OH, NO.

Q. WERE YOU GIVEN A WRITTEN POLICY?

A. NO, MA'AM. NO, MA'AM.

Q. AND YOU TOLD US THAT LAST INCIDENT WAS IN SEPTEMBER 2012. WHEN WAS YOUR LAST DAY OF EMPLOYMENT?

A. OCTOBER 5TH. IT WAS ON A FRIDAY.

Q. AND THAT WAS OCTOBER 5TH, 2012?

A. YES, YES, MA'AM, OCTOBER 5TH.

Q. TELL ME WHAT HAPPENED THIS DAY?

A. ON THAT DAY IT WAS IN THE LATER PART OF THE DAY AND

EVERYONE WAS LEAVING TO GO HOME. AND MR. FLAGGS, HE CAME OUT AND HE TOLD ME HE NEEDED TO SEE ME. AND WHEN HE CAME OUT, HE SAID I NEED TO SEE -- IS IT OKAY IF YOU COME TO THE OFFICE. SO I WENT AHEAD AND WENT TO THE OFFICE. WHEN I WENT INTO THE OFFICE, HE SAID, DR. HENSON ASKED ME TO LET YOU GO. AND I WAS, LIKE, LET ME GO FOR WHAT? AND HE WAS, LIKE, I DON'T KNOW. HE JUST TOLD ME TO JUST FIRE YOU. I WAS, LIKE, FIRE ME? AND HE HANDED ME THE PAPERS, THE DISMISSAL PAPERS. AND I LOOKED AT -- I WAS, LIKE, WELL, WHY -- BUT WHAT'S THE REASON? AND HE WAS, LIKE, YOU ALREADY KNOW. AND I -- AND I GOT THE PAPER AND I WENT TO MY DESK AND I STARTED TAKING DOWN MY SON'S PICTURES THAT I HAD AT MY DESK. AND I'M NOT A VIOLENT PERSON, SO I'M NOT GOING TO ACT OUT, BUT I WAS WALKING OUT OF THE OFFICE I COULD SEE DR. HENSON STANDING DOWN THE HALL. AND WHEN -- WELL, LET ME PUT DR. PARKS IN THERE BECAUSE HE WAS IN THERE WHEN MR. FLAGGS GAVE ME THE DISMISSAL PAPER.

Q. OKAY. LET ME STOP YOU THERE. DR. PARKS, WHO IS DR. PARKS?

A. DR. PARKS IS AN ASSOCIATE DOCTOR OF DR. HENSON.

Q. OKAY. SO A DENTIST?

A. YES, MA'AM. HE'S A DENTIST.

Q. OKAY. AND HE WAS IN THE ROOM WITH MR. FLAGGS WHEN MR. FLAGGS TERMINATED YOU?

A. TERMINATED ME, YES, MA'AM.

Q. OKAY. AND YOU SAID YOU SAW DR. HENSON?

A. YES, AND I WAS LEAVING OUT. AND I -- WHEN I ASKED

DR. PARKS (VERBATIM), DO HE KNOW WHY. AND HE WAS, LIKE, NO, BECAUSE YOU A GOOD PERSON. I DON'T SEE WHY. AND SO I WAS, LIKE, WELL, I'LL JUST GET MY STUFF AND GO. I COULD SEE DR. HENSON STANDING DOWN IN THE -- LIKE, AT THE END OF THE HALL LOOKING UP TOWARDS THE OFFICE. AND I PROCEEDED ON. I DIDN'T SAY ANYTHING TO HIM. I PROCEEDED TO GET MY THINGS. AND WHEN I GOT MY THINGS, DR. HENSON THEN CAME UP THE HALL AND WHEN HE CAME UP THE HALL HE SAID, I'M SORRY TO SEE YOU GO AND TRIED TO GIVE ME A HUG. AND I'M, LIKE, YOU JUST FIRED ME AND YOU TRYING TO HUG ME. AND I GOT MY THINGS AND LEFT.

Q. WHAT WERE YOU FEELING WHEN MR. FLAGGS SAID THAT DR. HENSON WANTED TO LET YOU GO?

A. TO JUST LET YOU ALL KNOW OR LET YOU KNOW, I FELT -- I FELT HELPLESS BECAUSE I'M A WOMAN, FIRST OF ALL. HE'S AN EMPLOYER. HE HAS MORE POWER AS FAR AS FIRING AND HIRING. I FELT REALLY BETRAYED BECAUSE I'VE BEEN WITH THIS COMPANY FOR FIVE YEARS AT THE MOST (VERBATIM). I'VE BEEN ON TIME, NO WRITE-UPS, NO COMPLAINTS, NO PATIENT -- PATIENTS USED TO BRING ME THINGS LIKE LITTLE GIFTS TO SHOW THEY APPRECIATE ME, NO PROBLEM WITH ME, NONE WHATSOEVER TO EVEN RAISE MY VOICE. AND HERE I AM GETTING, LIKE, ESCORTED OUT, YOU KNOW, BY THEM TO SAY, YOU'RE FIRED FOR NO REASON, CAN'T GIVE ME A REASON. AND I'VE BEEN DEDICATED TO THIS COMPANY. SO I FELT REALLY HURT. AND BEING A SINGLE MOTHER, NOW I GOT TO GO OUT AND LOOK FOR A JOB BECAUSE I GOT FIRED.

Q. OKAY. LET ME STOP YOU THERE. YOU SAID THAT MR. FLAGGS GAVE YOU YOUR NOTICE -- OR SEPARATION NOTICE; IS THAT CORRECT?
A. YES, MA'AM.
MS. MARTIN: YOUR HONOR, MAY I APPROACH THE WITNESS?
THE COURT: YES. AND YOU DON'T HAVE TO ASK. YOU CAN JUST APPROACH THE WITNESS. THAT'S FINE.
BY MS. MARTIN:
Q. I'M HANDING YOU WHAT'S BEEN MARKED AS PLAINTIFF'S EXHIBIT 1, AND ASK THAT YOU TAKE A LOOK AT THAT. DO YOU RECOGNIZE THAT DOCUMENT?
A. YES, MA'AM, I DO.
Q. WHAT IS IT?
A. IT'S A SEPARATION NOTICE FROM METRO DENTAL GROUP.
MS. MARTIN: YOUR HONOR, MAY WE ENTER THIS DOCUMENT INTO EVIDENCE?
THE COURT: ANY OBJECTIONS?
MR. VILLINES: NO OBJECTION, YOUR HONOR.
THE COURT: OKAY. DOCUMENT ADMITTED, EXHIBIT 1.
MS. MARTIN: AND, YOUR HONOR, WE PREVIOUSLY SHOWED THE JURY A DEMONSTRATIVE AID OF THIS. I'M ASSUMING THERE'S NO PROBLEM IF I DO IT ONCE AGAIN NOW IT'S ENTERED INTO EVIDENCE.
THE COURT: RIGHT. ANYTIME AN EXHIBIT IS ENTERED INTO EVIDENCE, YOU CAN SHOW IT TO THE JURY WITHOUT ASKING. THAT'S NOT A PROBLEM.
MS. MARTIN: GREAT. THANK YOU.

BY MS. MARTIN:
Q. MS. POLLARD, WHEN YOU LOOK AT THE SEPARATION NOTICE DO YOU SEE WHERE IT SAYS, REASON FOR SEPARATION, LACK OF WORK?
A. YES, MA'AM.
Q. AND WHAT DID THAT MEAN TO YOU?
A. LACK OF WORK MEANING THAT THERE'S NOT ENOUGH WORK FOR EMPLOYEES.
Q. DID YOU UNDERSTAND WHY THAT WAS ON THE SEPARATION NOTICE?
A. NO, MA'AM. I DIDN'T UNDERSTAND THAT AT ALL.
Q. DID MR. FLAGGS EXPLAIN THAT TO YOU?
A. NO, HE DIDN'T EXPLAIN THAT.
Q. MS. POLLARD, AFTER MR. FLAGGS TOLD YOU THAT DR. HENSON WAS TERMINATING YOU AND YOU LEFT, WHAT DID YOU DO?
A. I TALKED TO MY AUNT WHEN I GOT HOME AND I -- MY AUNT ALREADY KNEW THE SITUATION. SHE KNEW OF THE INCIDENTS AND SHE TOLD ME THEN I NEEDED TO REPORT THAT. SO I DID CALL HER WHEN I GOT HOME AND I TOLD HER THAT I -- THAT THEY HAD FIRED ME, AND SHE TOLD ME, YOU NEED TO CALL THE E.E.O.C., AND I DID.
Q. AND THAT'S THE EQUAL EMPLOYMENT OPPORTUNITY COMMISSION?
A. YES, MA'AM.
Q. WHEN DID YOU CONTACT THE E.E.O.C. FOR THE FIRST TIME?
A. I CONTACT THEM, LIKE, WITHIN THAT WEEK. IT WAS FRIDAY WHEN THEY LET ME GO, BUT THE NEXT WEEK I CONTACT THEM.
Q. AND HOW DID YOU CONTACT THEM?
A. BY PHONE.

Q. AND WHO DID YOU SPEAK WITH AT THE E.E.O.C.?
A. IT WAS A REPRESENTATIVE, IN-TAKE PERSON TO IN-TAKE YOUR INFORMATION. AND SINCE SHE SENT OUT -- SHE SENT OUT A APPLICATION TO ME.
Q. AND DID YOU RECEIVE -- IT WAS LIKE A QUESTIONNAIRE?
A. YES, MA'AM, A QUESTIONNAIRE APPLICATION YOU JUST TELL IN DETAIL WHAT HAPPENED.
Q. OKAY. YOU RECEIVED THAT IN THE MAIL?
A. YES, MA'AM, I DID.
Q. AND DID YOU FILL IT OUT?
A. YES, I SURE DID.
Q. HOW LONG AFTER YOU SPOKE WITH THE E.E.O.C. ON THE PHONE DID YOU RECEIVE IT IN THE MAIL?
A. IT WASN'T LONG. IT CAME, LIKE, WITHIN TWO TO THREE DAYS.
Q. AND ONCE YOU RECEIVED IT HOW LONG UNTIL YOU FILLED IT OUT?
A. I IMMEDIATELY FILLED IT OUT, AND WHEN I FILLED IT OUT I MAILED IT RIGHT BACK IN.
Q. AND IN THE QUESTIONNAIRE WHAT DID YOU SAY TO THE E.E.O.C.?
A. I SPECIFICALLY TOLD THEM -- BECAUSE EVERYTHING WAS SO FRESH ON MY MIND, AND I TOLD THEM EXACTLY WHAT I'M TELLING EVERYONE HERE TODAY, MY SITUATION AND WHAT HAPPENED TO ME AS BEING A GOOD EMPLOYEE AND THAT I WAS SEXUALLY HARASSED I FELT AND VIOLATED AS AN ASSOCIATE.
Q. DID YOU TELL THE E.E.O.C. ABOUT EACH INCIDENT?
A. OH, YES, MA'AM, I SURE DID. I TOLD THEM OF EACH INCIDENT,

HOW IT STARTED. I EVEN EXPLAINED TO THEM OF MY MOTHER'S SITUATION WITH MY BROTHER, HOW HE STARTED, YOU KNOW, A CONVERSATION WITH ME ABOUT HOW WAS I HAVING SEX AND THINGS OF THAT NATURE. I EXPLAINED EVERYTHING TO THEM FROM BEGINNING TO END.

Q. DID YOU TELL THE E.E.O.C. THAT DR. HENSON HAD TOUCHED YOU?

A. OH, YES, MA'AM, I SURE DID.

Q. DID YOU TELL THE E.E.O.C. THAT HE HAD PUT HIS HAND DOWN YOUR PANTS?

A. YES, MA'AM.

Q. MS. POLLARD, HAVE YOU EVER HAD ANY WORK ISSUES WITH TRACY LOVELACE KENNEDY?

A. NO, MA'AM. WE DID HAVE ONE ENCOUNTER ONLY BECAUSE I AM, LIKE I SAID, THE CHECK -- I WAS THE CHECK-OUT PERSON. AND IF THE INSURANCE ISN'T ENTERED RIGHT, WHICH SHE WAS THE CHECK-IN, SO SHE ENTERED THE PATIENT, NEW PATIENT INFORMATION AND THE INSURANCE -- IT WOULD CONFLICT WITH MY CHECK-OUT AND MY TREATMENT PLANNING.

Q. DID MR. FLAGGS EVER COUNSEL YOU FOR ANY TYPE OF MISBEHAVIOR?

A. NO, NO, MA'AM, HE DIDN'T.

Q. DID MR. FLAGGS EVER WRITE YOU UP FOR ANY MISBEHAVIOR?

A. NO, MA'AM.

Q. DID MR. FLAGGS EVER SUSPEND YOU FOR ANY --

A. NO, MA'AM.

Q. DID MR. FLAGGS EVER PUT YOU ON A PERFORMANCE IMPROVEMENT PLAN?
A. NO, MA'AM.
Q. DID MR. FLAGGS EVER THREATEN TO TERMINATE YOU BECAUSE OF YOUR BEHAVIOR?
A. NO, MA'AM.
Q. WERE YOU EVER TOLD YOU WERE MAKING MISTAKES AT WORK?
A. NO, MA'AM.
Q. DID YOU HAVE ANY ISSUES WITH ANY PATIENTS?
A. NO, MA'AM. PATIENTS LOVED ME.
Q. DO YOU KNOW A PATIENT, MS. UPSHAW?
A. I DON'T RECALL MS. UPSHAW, NO, MA'AM.
Q. DO YOU RECALL TURNING A PATIENT AWAY AT 5:00?
A. NO, MA'AM. I WAS -- LIKE I WAS SAYING, I WAS THE CHECK-OUT PERSON, SO I DIDN'T SIT AT THE FRONT DESK AND CHECK PATIENTS IN, SO I WOULDN'T REALLY TURN ANYBODY AWAY. AND WE DIDN'T -- WE DIDN'T HAVE PERMISSION TO TURN PATIENTS AWAY. THE DOCTORS HAD THAT PERMISSION ONLY. AND LIKE I WAS SAYING, I WAS THE CHECK-OUT PERSON, SO I SAT TO THE RIGHT. IF ANYBODY WALK IN THE DOOR, THEY GOING TO TALK TO TRACY ANYWAY. THEY NOT GOING TO TALK TO ME.
Q. MS. POLLARD, TELL ME HOW IT'S AFFECTED YOU WHEN YOU HAD THESE INCIDENTS WITH DR. HENSON?
A. IT JUST -- IT AFFECT MY BEHAVIOR A WHOLE LOT BECAUSE JUST BEING A WOMAN, I FELT VERY VIOLATED. AND I WAS, YOU KNOW, IN A

RELATIONSHIP. AND I DON'T WANT TO BE TOUCHED BY NOBODY ELSE AND NOT WHEN YOU TRYING TO BE A FAITHFUL -- FAITHFUL PERSON. BUT I REALLY FELT DISTRAUGHT AND I REALLY DIDN'T WANT TO GO TO WORK ANYMORE AFTER THAT. I FELT VERY AFRAID OF GOING TO WORK, BUT BY WILL TELLING ME HE WOULD TAKE CARE OF IT, IT GAVE ME A BOOST TO GO BACK TO WORK EACH TIME JUST KNOWING THAT HE WAS SAYING, I'LL TAKE CARE OF IT, I'LL TAKE CARE OF IT. IT GAVE ME A BOOST TO GO BACK TO WORK.
Q. AND WERE THERE TIMES WHEN YOU WERE WORKING THAT EVERYTHING WAS OKAY?
A. YES, MA'AM.
Q. AND DID YOU THINK THAT WAS BECAUSE WILL HAD TALKED TO DR. HENSON?
A. YES, MA'AM.
Q. TELL ME HOW IT AFFECTED YOU WHEN YOU WERE TERMINATED.
A. A LOT -- A LOT WENT THROUGH MY HEAD. LIKE I WAS SAYING, I WAS REALLY TRYING TO START LOOKING FOR ANOTHER JOB ONCE THE LAST INCIDENT HAPPENED. I COULDN'T TAKE IT NO MORE. I JUST FELT LIKE I'M A SINGLE MOM NOW, I GOT TO RUN OUT AND TRY TO FIND ME A QUICK JOB OR SOMETHING, QUICK BECAUSE I HAVE BILLS, I HAVE RESPONSIBILITY. AND I'VE ALWAYS TAKEN CARE OF MY KIDS AND MY RESPONSIBILITY, BUT NOW I HAD BEEN WITH THEM FOR FIVE YEARS, YOU KNOW. IT BOTHERED ME BECAUSE NOW I HAVE TO START OVER, YOU KNOW, A LOT WENT THROUGH MY HEAD. I FELT EMOTIONAL. I WAS JUST VERY -- I WAS VERY EMOTIONAL FOR A LONG TIME, LIKE, I COULD

REALLY TALK ABOUT IT A LITTLE BIT NOW.
Q. DID YOU SEEK HELP?
A. I SEEK -- JUST FAMILY AND PRAYER, YOU KNOW. I DID JUST TALK TO MY MOM AND THE GUY I WAS DATING. HE TOLD ME I NEED TO LEAVE THERE, AND MY AUNT AND JUST A LOT OF PRAYER, A LOT OF PRAYER.
Q. AT THE TIME THAT YOU WERE TERMINATED HOW MUCH WERE YOU BEING PAID?
A. $14 AN HOUR.
Q. AND ABOUT HOW MANY HOURS PER WEEK WERE YOU WORKING?
A. 40 HOURS. I WAS FULL TIME.
Q. AFTER DR. HENSON TERMINATED YOU DID YOU TRY TO GO BACK TO WORK?
A. YES, MA'AM.
Q. WHERE DID YOU TRY TO GO BACK TO WORK?
A. I WAS SEEKING ON DENTAL POSTS JUST LOOKING FOR JOBS, GOING FOR INTERVIEWS, WORKING INTERVIEWS.
Q. I'M SORRY. LET ME STOP YOU THERE. DENTAL POST IS ON-LINE?
A. YES, MA'AM.
Q. AND IT'S --
A. JUST ON-LINE LOOKING FOR JOBS.
Q. FOR DENTAL OFFICES?
A. YES, MA'AM.
Q. OKAY. SO YOU APPLIED FOR JOBS?
A. YES, I DID.

Q. DID YOU GO ON INTERVIEWS?
A. YES, I DID.
Q. AND DID YOU LIST THAT YOU HAD WORKED?
A. YES. I LIST (VERBATIM) METRO DENTAL, ALTHOUGH I KNOW DOCTORS KNOW EACH OTHER, SO I WAS REALLY WORRIED AND STRESSED OUT ABOUT THAT AS WELL.
Q. AND DID YOU GET ANY OF THOSE JOBS THAT YOU APPLIED FOR?
A. NO, MA'AM, NO, MA'AM, NOT AT THE TIME. I DID WORKING INTERVIEWS, BUT NO ONE CALLED ME BACK.
Q. DID YOU FIND OTHER EMPLOYMENT DURING THIS TIME?
A. SO, YES, MA'AM. FINALLY I WENT TO A TEMP AGENCY. AND THE LADY AT THE OFFICE, SHE WOULD JUST FIND ME LITTLE JOBS HERE AND THERE UNTIL I FOUND A FULL-TIME POSITION, YES, MA'AM.
Q. OKAY. WHEN DID YOU FIND A FULL-TIME POSITION?
A. I FOUND A FULL-TIME POSITION LAST YEAR.
Q. GIVE ME A DAY, APPROXIMATE DATE?
A. SEPTEMBER OF 2015.
Q. AND WHERE IS THAT?
A. GENTLE FAMILY DENTISTRY IN STONE MOUNTAIN.
Q. AND WHO HIRED YOU THERE?
A. DR. BETTY DILLON.
Q. SHE'S A FEMALE DENTIST?
A. SHE'S A FEMALE, YES.
Q. AND YOU SAID YOU WORKED FOR A TEMP AGENCY --
A. YES, MA'AM.

Q. -- PLACED?
A. YES, MA'AM.
Q. YOU WERE TERMINATED OCTOBER 5TH, YOU TOLD US. BETWEEN OCTOBER 5TH, 2012, UNTIL DECEMBER 31ST, 2012, DO YOU REMEMBER IF YOU WORKED ANYWHERE?
A. YES, MA'AM. I -- LIKE I WAS SAYING, THE TEMP AGENCY WAS SENDING ME ON LITTLE ASSIGNMENTS. IT WAS PART TIME, BUT IT WAS JUST SOMETHING TO HAVE UNTIL I FOUND A FULL-TIME JOB. SO I WAS WORKING IN BETWEEN.
Q. OKAY. AND DURING THAT SHORT TIME PERIOD DO YOU RECALL HOW MUCH YOU MADE?
A. ROUGHLY AROUND MAYBE 7,000 BECAUSE, LIKE I SAID, IT WAS PART TIME. YOU KNOW, LIKE, IF SHE HAVE AN ASSIGNMENT OR A DOCTOR THAT NEEDED SOMEONE FOR THE FRONT DESK, SHE WOULD CALL ME.
Q. OKAY. NOW, I'M TALKING ABOUT JUST THE SHORT PERIOD OF TIME IN 2012. DO YOU RECALL HOW MUCH YOU MADE DURING --
A. OH, 2012.
Q. YOU WERE TERMINATED AND THEN WE'RE JUST TALKING ABOUT THE REST OF THAT YEAR.
A. OH, OKAY. THAT YEAR.
Q. YES.
A. 2012.
Q. DO YOU RECALL?
A. NO. THAT YEAR I WASN'T WORKING.

Q. OKAY.
A. I WAS LOOKING FOR JOBS.
Q. OKAY.
A. YES, MA'AM.
Q. AND THEN LET'S TALK -- 2013, IS THAT WHEN YOU SAID YOU WERE WORKING SOME TEMP AGENCY?
A. YES, MA'AM. THAT'S WHEN I FINALLY KIND OF SURRENDERED TO LOOKING FOR PERMANENT JOBS BECAUSE I KNOW THEY WAS GOING DIRECTLY PROBABLY TO -- CALLING METRO. SO I KIND OF GOT WORRIED THINKING MAYBE THEY'RE MESSING WITH THE REPUTATION, YOU KNOW, MY REPUTATION. SO I WENT TO A TEMP AGENCY THE LATTER PART OF 2013.
Q. OKAY. AND DO YOU RECALL IN 2013 APPROXIMATELY HOW MUCH YOU MADE THROUGH THE TEMP AGENCY?
A. ROUGHLY AROUND 6,000 FOR THAT YEAR.
Q. AND THEN IN 2014 DID YOU CONTINUE TO APPLY FOR JOBS?
A. YES, MA'AM. AND ALSO THAT CHRISTMAS I WORKED AT MACY'S FOR SEASONAL MACY'S IN SOUTHLAKE MALL, YOU KNOW, FOR CHRISTMAS HELP IN THE FRAGRANCE DEPARTMENT.
Q. OKAY. NOW, I THINK EARLIER IN YOUR TESTIMONY YOU SAID YOU HAD WORKED AT MACY'S. IS THIS THE SAME MACY'S?
A. YES, MA'AM.
Q. OKAY. SO THEY HIRED YOU BACK?
A. YES, MA'AM.
Q. OKAY. AND SEASONAL MEANING CHRISTMAS, CHRISTMASTIME?
A. YES, MA'AM.

Q. OKAY. DO YOU REMEMBER HOW MUCH YOU MADE AT MACY'S DURING THIS SEASONAL TIME?
A. $3,000, BECAUSE IT WAS FOR TWO TO THREE MONTHS.
Q. OKAY. AND THEN IN 2014 TIME FRAME YOU STILL WORKED TEMP AGENCY JOBS?
A. YES, MA'AM.
Q. AND DO YOU RECALL HOW MUCH YOU MADE APPROXIMATELY?
A. 5,000 OR 6,000.
Q. AND THEN BEFORE YOU WERE HIRED AT THE DENTAL OFFICE IN STONE MOUNTAIN IN 2015, DID YOU DO ANY MORE TEMP AGENCY WORK?
A. NO, MA'AM. I WAS WITH ONE TEMP AGENCY ALL THE WAY UP UNTIL I BECAME FULL TIME.
Q. OKAY. SO YOU WERE STILL --
A. WITH THAT TEMP AGENCY.
Q. OKAY.
A. YES, MA'AM.
Q. AND DO YOU RECALL HOW MUCH YOU MADE IN 2015 FROM THE TEMP AGENCY?
A. ROUGHLY, LIKE, 3,000, $3,000, YES, MA'AM.
Q. AND DURING THIS TIME PERIOD WERE YOU STILL CONTINUING TO APPLY FOR JOBS?
A. I FAITHFULLY APPLIED.
Q. NOW, HOW DID YOU PAY YOUR BILLS DURING THIS TIME PERIOD?
A. WELL, AFTER THE -- AFTER THE SITUATION HAPPENED, I HAD TO MOVE OUT MY APARTMENT. AND BECAUSE IT WAS -- IT GOT HARD, YOU

KNOW WHAT I MEAN, AND ME AND MY SON, WE HAD TO MOVE IN WITH MY AUNT.

MS. MARTIN: NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT: OKAY. THANK YOU.

OKAY. MR. VILLINES, YOU MAY PROCEED.

MR. VILLINES: THANK YOU, YOUR HONOR.

CROSS-EXAMINATION

BY MR. VILLINES:

Q. MAY IT PLEASE THE COURT. GOOD AFTERNOON, MS. POLLARD. WE'VE MET BEFORE.

A. YES, SIR.

Q. WHAT YEAR DID YOU COME TO ATLANTA, MS. POLLARD?

A. 2005.

Q. HOW OLD WERE YOU AT THAT TIME?

A. 32.

Q. AND IF YOU WOULD TELL ME YOUR WORK HISTORY BEGINNING AT THAT POINT WHEN YOU CAME TO ATLANTA AND HOW LONG YOU STAYED AT THOSE PLACES IT MIGHT HELP US.

A. OKAY.

Q. THANK YOU.

A. WHEN I -- WHEN I MOVED TO ATLANTA I WAS -- I STARTED AT MACY'S, MACY'S IN SOUTHLAKE MALL. AND I WAS FULL TIME THERE. AND I WAS DOING MACY'S BECAUSE I JUST WANTED TO MAKE SURE THAT I HAD A JOB, A STEADY JOB.

Q. HOW MUCH DID YOU MAKE? DO YOU RECALL?

A. 975 PLUS COMMISSION.
Q. OKAY. EXCUSE ME. YOU WANT SOME WATER?
A. NO, SIR. I'M FINE. THANK YOU.
Q. OKAY. ABOUT HOW LONG WERE YOU THERE?
A. I WAS AT MACY'S TWO YEARS.
Q. THREE YEARS?
A. TWO YEARS, YES, SIR.
Q. THEN AFTER YOU LEFT MACY'S, WHERE?
A. I WENT TO METRO DENTAL.
Q. IS THAT METRO DENTAL OR THE DENTURE PLACE?
A. I'M SORRY. THE DENTURE PLACE.
Q. THAT'S OKAY. NO PROBLEM. AND THAT'S IN MCDONOUGH; RIGHT?
A. YES, SIR, IT IS.
Q. AND THAT WOULD BE IN 2006. DO YOU RECALL THE MONTH APPROXIMATELY YOU WENT THERE?
A. I BELIEVE IT'S AROUND JUNE OF 2008.
Q. YOU LEFT IN JUNE OF 2008?
A. NO. YOU WAS SAYING WHEN DID I GO TO THE MCDONOUGH OFFICE?
Q. YES, MA'AM.
A. 2008.
Q. OKAY. AROUND JUNE OF 2008?
A. YES, SIR.
Q. AND HOW LONG DID YOU WORK THERE?
A. I WORKED THERE UNTIL 2010 AND THEN I WENT TO THE ATLANTA OFFICE.

Q. AND WHEN IN 2010 DID YOU LEAVE? THE MONTH IS GOOD ENOUGH.
A. YEAH. AUGUST, AUGUST OF 2010.
Q. AND WHEN DID YOU START WORKING -- AND THEN YOU LEFT THERE AT DENTURE PLACE AND WENT WHERE? EXCUSE ME.
A. I WENT -- WHEN I LEFT THE DENTURE PLACE, I WENT TO METRO DENTAL.
Q. YES, MA'AM.
A. IN ATLANTA.
Q. OFF CLEVELAND AVENUE?
A. OFF CLEVELAND AVENUE.
Q. AND WHEN WOULD THAT BE?
A. IT WAS ROUGHLY SEPTEMBER. IT WAS A WEEK OR TWO RIGHT AFTER, RIGHT AFTER I LEFT THE DENTURE PLACE I WENT TO METRO DENTAL, ATLANTA.
Q. SO THERE WAS ABOUT A MONTH OF LAPSE THERE BEFORE YOU LEFT --
A. NO, SIR.
Q. OKAY. GO AHEAD?
A. A WEEK, MAYBE A WEEK OR TWO, NOT LONG.
Q. I'M A LITTLE PUZZLED BY PLAINTIFF'S EXHIBIT 1. ON THE PERIOD OF LAST EMPLOYMENT IT SAYS MARCH 11TH. IS THAT INCORRECT?
MR. VILLINES: MAY I APPROACH, YOUR HONOR?
THE COURT: YES.

BY MR. VILLINES:
Q. I THINK YOU'VE GOT IT RIGHT THERE IN FRONT OF YOU.
A. I DO. OKAY. THE TIME LINE MAY BE OFF A LITTLE BIT, BUT I DON'T KNOW EXACTLY THE DATE, BUT I KNOW IT WAS, LIKE, A WEEK OR -- A WEEK OR TWO WHEN I LEFT THE DENTURE PLACE AND WENT TO METRO DENTAL.
Q. AUGUST 2010 TO MARCH 2011, THAT WOULD BE OFF ABOUT SEVEN MONTHS. SO I'M JUST TRYING TO FIGURE OUT WHICH IS CORRECT.
A. WELL, YES, SIR, LIKE I -- LIKE I'M SAYING, I'M -- THE LAST DATE AT THE DENTURE PLACE, I REALLY CAN'T RECALL. I'M JUST GIVING A ROUGH DRAFT OF WHEN I THINK IT WAS.
Q. OKAY. AND YOU THINK IT WAS -- YOU THINK YOU LEFT THERE IN AUGUST OF 2010 AND WENT -- AT THE DENTURE PLACE AND THEN WENT TO WORK THE NEXT WEEK OR SO AT METRO DENTAL, SO YOU WOULD THINK THAT THE SEPARATION DOCUMENT THAT YOU PUT IN EXHIBIT 1 WHICH SAYS MARCH 2011 WOULD BE INACCURATE?
A. WELL, IT DEPENDS ON THE DAY THAT I LEFT THE DENTURE PLACE.
Q. MA'AM?
A. IT DEPENDS ON THE DATE I LEFT THE DENTURE PLACE. I REALLY CAN'T RECOLLECT IN MY MEMORY EXACT DATES.
Q. I'M NOT ASKING FOR EXACT. THIS IS EIGHT MONTHS DIFFERENCE. I'M JUST ASKING TO RECONCILE IT IF YOU CAN. IF YOU CAN'T, THAT'S FINE.
A. OKAY.
Q. OKAY. THANK YOU.

A. THANK YOU.
Q. DID YOU WORK WITH DR. HENSON ON A DAILY BASIS DOWN AT THE DENTURE PLACE IN MCDONOUGH?
A. YES, SIR.
Q. NO PROBLEMS?
A. NO PROBLEMS.
Q. AND TELL ME AGAIN WHO YOUR DIRECT SUPERVISOR WAS AT THE DENTURE PLACE?
A. AT THE DENTURE PLACE, MS. JENNIFER FLAGGS.
Q. DO YOU KNOW IF METRO DENTAL CONTESTED YOUR SEPARATION SO YOU WOULDN'T GET UNEMPLOYMENT OR NOT? DID THEY CONTEST IT?
A. NO, SIR.
Q. HOW LONG DID YOU DRAW? I THINK YOU SAID FOR A MINUTE. HOW LONG DID YOU DRAW EMPLOYMENT?
A. A YEAR.
Q. ABOUT A YEAR AND A HALF?
A. YES, SIR.
Q. WOULD THAT BE A MINUTE TO YOU?
A. MAYBE SO, YES, SIR.
Q. OKAY. THAT'S FINE. AND YOU'RE NOT EXACTLY SURE OF THOSE DATES OF WHEN YOU LEFT THE DENTURE PLACE AND WHEN YOU WENT TO METRO DENTAL, BUT THERE REALLY WASN'T MUCH LAG TIME, WOULD BE YOUR TESTIMONY?
A. WELL, THE REASON I DON'T RECALL IS BECAUSE I DIDN'T HAVE TO RETRAIN, I DIDN'T HAVE TO DO ANYTHING OVER, SO I JUST WENT FROM

ONE LOCATION TO ANOTHER, SO I WASN'T EXACT. IT'S NOT LIKE I WAS SEPARATED FROM THE DENTURE PLACE WITH A SEPARATION NOTICE OR ANYTHING WITH THE DATES ON IT.
Q. YOU HAD COMMENTED EARLIER THAT MR. FLAGGS HAD SENT YOU DOWN TO THE DENTURE PLACE LOCATION?
A. YES, SIR.
Q. AND THEN YOU HAD COMMENTED THAT THE MCDONOUGH OFFICE WOULD NOTIFY MR. FLAGGS THAT YOU WERE AT THE DENTURE PLACE?
A. NO, THAT'S NOT WHAT I SAID. I SAID THAT HE WOULD -- MS. FLAGGS, WHICH IS JENNIFER FLAGGS, WOULD GIVE HIM MY HOURS FROM WHEN I WAS DOWN THERE BECAUSE I HAD TO CLOCK IN AND CLOCK OUT.
Q. OKAY. YOU MENTIONED SOME INTERNS, I BELIEVE MISTY WRIGHT AND APRIL JENNINGS?
A. YES, SIR.
Q. ARE INTERNS PAID?
A. NO, SIR.
Q. DO YOU RECALL THE FIRST TIME YOU ALLEGEDLY TOLD MR. FLAGGS ABOUT INAPPROPRIATENESS?
A. YES, SIR.
Q. WHERE WERE YOU?
A. WHEN I TOLD HIM?
Q. YES.
A. I WAS AT METRO DENTAL ATLANTA OFFICE.
Q. OKAY. AND WHERE IN THAT OFFICE WERE YOU?

A. WHEN I TOLD HIM, I WAS BACK AT MY DESK.
Q. NOW, I WANT YOU TO DESCRIBE FOR THE JURY BECAUSE THEY'VE NEVER BEEN THERE. TELL US JUST A LITTLE BIT ABOUT THE METRO DENTAL OFFICE THERE ON CLEVELAND AVENUE.
A. WHEN YOU ENTER INTO -- YOU HAVE THE RIGHT SIDE, THE PARKING LOT JUST COMES AROUND THE BUILDING. YOU HAVE A RIGHT SIDE AND A LEFT SIDE. AND WHEN YOU COME INTO EITHER DOOR, THE WAITING AREA IS SITTING IN THE FRONT OF THE OFFICE, AND THEN THE DESK IS RIGHT HERE. WELL, THE CHECK-IN PERSON IS SITTING IN THE FRONT, AND THEN THE CHECK-OUT PERSON IS SITTING TO YOUR RIGHT. AND RIGHT BEYOND WHEN YOU COME IN FOR CHECK-IN, YOU HAVE OPERATORIES (PHONETIC) DOWN THE HALL, YOU HAVE A CHART AREA, LIKE, IT WOULD BE BEHIND US, AND THEN YOU HAVE DR. HENSON'S OFFICE IS TO THE LEFT OF US. YOU HAVE OTHER OPERATORIES DOWN THE LEFT SIDE OF THE HALL. YOU HAVE YOUR LABORATORY IN THE FAR BACK OF THE OFFICE, AND YOU HAVE RESTROOMS, OF COURSE, IN BETWEEN.
Q. NOW, MS. POLLARD, WHEN YOU WOULD BE SITTING AT YOUR DESK UP FRONT -- AND THAT WOULD BE UP FRONT; IS THAT CORRECT?
A. YES, SIR.
Q. WHO ELSE WOULD NORMALLY BE THERE?
A. TRACY LOVELACE.
Q. WOULD AUDRY BE THERE OR ANYBODY ELSE?
A. AUDRY?
Q. AUDRY. ANYBODY ELSE IN THAT OFFICE BE THERE OR JUST --

A. ASSISTANTS ARE NEVER REALLY UP AT THE FRONT BECAUSE THEIR LAB JACKETS AND THINGS LIKE THAT, THEY ARE NOT ALLOWED TO BE JUST SITTING AROUND THE FRONT DESK, NO, SIR, THAT'S NOT ALLOWED.
Q. OKAY. SO ARE YOU TELLING US THAT IT WAS JUST THE TWO OF YOU AT THE FRONT DESK?
A. YES, SIR.
Q. WOULD IT BE -- WOULD IT BE FAIR TO SAY THAT DR. HENSON'S OFFICE IS THE CLOSEST TO THE FRONT DESK?
A. YES, SIR, IT'S PRETTY MUCH RIGHT THERE.
Q. OKAY. IF I STEP OUT OF DR. HENSON'S OFFICE, WHAT WOULD I STEP INTO?
A. YOU WOULD STEP INTO THE HALLWAY.
Q. AND THAT HALLWAY IS HOW CLOSE FROM THE FRONT DESK AREA?
A. IT'S -- IT'S MID-WAYS. I MEAN, IT'S, LIKE, RIGHT THERE. THE FRONT DESK, A LOT COULD BE GOING ON. HIS OFFICE -- IT'S A WALL HERE, AND THEN YOU WALK AROUND AND THEN YOU TURN INTO DR. HENSON'S OFFICE.
Q. WOULD IT BE FAIR TO SAY THAT DR. HENSON'S OFFICE IS CLOSER TO THE FRONT DESK THAN I AM TO YOU?
A. I MEAN, WITH A WALL THERE, ANYTHING COULD BE POSSIBLE, YES.
Q. THANK YOU.
A. YOU'RE WELCOME.
Q. AND YOU SAID THAT MR. FLAGGS, WILL, SENT YOU HOME A COUPLE OF TIMES; IS THAT CORRECT?
A. HE LET ME GO HOME EARLY, YES, SIR, THAT'S CORRECT.

Q. AND YOU WOULD NORMALLY BE ON THE FRONT DESK, YOU WOULD BE THE LAST PERSON THERE; RIGHT? IS THAT CORRECT?
A. YES, SIR.
Q. AND WHAT TIME DO YOU CLOSE?
A. WE SEE OUR LAST PATIENT AROUND 4, 4:00.
Q. AND THEN --
A. WE'RE DONE BY 5.
Q. EVERYONE ELSE WOULD LEAVE OR YOU WOULD BE THERE OR MOST OF THEM WOULD LEAVE?
A. MR. FLAGGS WOULD SOMETIMES BE IN HIS OFFICE, SO HE'S IN THERE WHILE I'M COUNTING DOWN, CLOSING OUT AT THE END OF THE DAY.
Q. HOW ABOUT TRACY, DID TRACY LEAVE BEFORE YOU?
A. YES, SIR, SOMETIMES TRACY WOULD LEAVE BEFORE ME. IT DEPENDS ON YOUR PATIENT LOAD AS WELL.
Q. SO THERE WOULD BE NOTHING UNUSUAL ABOUT YOU SEEING A PATIENT THAT WALKED IN AT 5:00 AND NO ONE ELSE WOULD BE THERE, WOULD THAT BE CORRECT?
A. WELL, THAT'S WHAT I WAS JUST SAYING. IT DEPENDS ON YOUR PATIENT LOAD. BECAUSE IF WE STILL HAVE PATIENTS, TRACY CAN'T LEAVE AND I CAN'T EITHER.
Q. WHAT I'M ASKING IS THAT IF YOU'RE THE LAST PERSON IN THE OFFICE AND TRACY LEAVES, IF A PATIENT COMES IN EITHER AT THE TIME OF CLOSING AT 5:00 OR AFTER HOURS, IT WOULD NOT BE UNUSUAL THAT YOU WOULD BE THE ONLY PERSON THERE TO SEE THAT PATIENT; IS

THAT CORRECT?
A. IF IT'S AFTER 5, PRETTY MUCH TRACY WAS STAYING UNTIL 5:00.
Q. DID YOU FILL OUT A PERSONNEL FORM WHEN YOU STARTED WORK AT METRO AND WHEN YOU STARTED WORK AT THE DENTURE PLACE THAT STATED YOUR NAME AND ALL THAT STUFF?
A. AT THE DENTURE PLACE?
Q. YES, MA'AM. DID ANYBODY OUT OF EVER (VERBATIM) THE DENTURE PLACE --
A. THE DENTURE PLACE, I DID A APPLICATION.
Q. OKAY. AND DID YOU -- WHAT'D YOU PUT ON THAT APPLICATION?
A. MY ADDRESS, MY SOCIAL, ALL OF MY INFORMATION, MY WORK HISTORY.
Q. WOULD YOU TELL ME WHY DR. HENSON WOULD NEED TO ASK YOU FOR YOUR ADDRESS IF YOU PUT IT ON THAT FORM?
A. I DID MOVE, YES, SIR.
Q. DID YOU UPDATE YOUR ADDRESS?
A. NO, SIR, I DIDN'T.
Q. SO AN ADDRESS ON THE FORM AT THE DENTURE PLACE SHOULD REFLECT THE SAME THING YOU HAVE AT -- ON YOUR FORM AT METRO DENTAL?
A. WHEN I MOVED, I DIDN'T CHANGE MY ADDRESS IN THE SYSTEM OR CHANGE IT WITH DR. HENSON.
Q. HOW LARGE IS DR. HENSON'S OFFICE? AND I'M TALKING ABOUT THE OFFICE THAT HE ACTUALLY HAD BEEN IN.
A. WHAT WAS YOUR QUESTION, SIR?

Q. IN HIS SEPARATE PERSONAL OFFICE, HOW LARGE IS THAT OFFICE APPROXIMATELY?
A. IT'S BIGGER THAN THIS. I MEAN, A NICE SIZE. IT JUST HAVE A LOT OF THINGS IN IT.
Q. DO YOU THINK IT'S ABOUT EIGHT BY EIGHT, TEN BY TEN?
A. I'M NOT FOR SURE.
Q. OKAY.
A. IT'S RATHER SMALL. I DO KNOW IT'S KIND OF SMALL, JUST DON'T KNOW THE SIZE.
Q. AND WHAT WAS YOUR ADDRESS WHEN YOU WERE AT THE DENTURE PLACE?
A. IT WAS BRIANNA (PHONETIC) DRIVE.
Q. AND WHAT WOULD HAVE BEEN YOUR ADDRESS AFTERWARDS?
A. COACH WAY.
Q. PARDON ME?
A. COACH WAY, IN JONESBORO.
Q. AND WHOSE ELSE (VERBATIM) OFFICE WAS IN THE PERSONAL OFFICE OF DR. HENSON?
A. WHO ELSE'S OFFICE?
Q. WHO ELSE SHARED AN OFFICE WITH HIM?
A. MR. FLAGGS WOULD BE IN THERE AS WELL.
Q. I'M SORRY. BE IN THERE WHAT?
A. HE WOULD BE IN THERE.
Q. OKAY.
A. WHEN DR. HENSON WASN'T THERE.

Q. DID HE HAVE A DESK IN THERE AS WELL?
A. THEY USED THE SAME DESK IF HE'S NOT THERE, GO BACK AND FORTH.
Q. WAS MR. FLAGGS IN THAT OFFICE MORE THAN DR. HENSON?
A. MAYBE 50, 50.
Q. NOW, WHEN WAS YOUR FIRST EMPLOYMENT AFTER YOUR UNEMPLOYMENT EXPIRED?
A. 2000 -- THE LATTER PART OF 2013.
Q. AND TELL ME WHAT IS PHILLY (PHONETIC) UNIQUE STYLE SHOP.
A. THAT'S JUST WHAT I WANTED TO -- I WANTED TO OWN ME A SHOP SOME DAY, SO THAT'S MY NAME WITH UNIQUENESS (VERBATIM).
Q. AND YOU FOUNDED THAT IN 2010 APPROXIMATELY?
A. I NEVER OWNED IT. THAT WAS -- THAT'S ACTUALLY JUST ON MY FACEBOOK PAGE.
Q. I KNOW. I'M TRYING TO FIND OUT --
A. I NEVER -- I NEVER OWNED THE SHOP. IT'S I JUST WANTED.
Q. OKAY. NOTHING WRONG WITH DREAMS.
A. RIGHT. EXACTLY.
Q. NOTHING WRONG WITH DREAMS.
A. YES, SIR.
Q. SO IT'S NOTHING THAT YOU EVER WORKED AT OR MADE MONEY?
A. NO.
Q. AFTER THIS HAPPENED YOU SAID YOU SPOKE TO YOUR AUNT AND YOUR AUNT ADVISED YOU TO FILE AN E.E.O.C. COMPLAINT; IS THAT CORRECT?

A. YES, SIR.
Q. AND YOU FILLED OUT SOME FORMS AND THEY SENT SOME FORMS TO METRO DENTAL; IS THAT CORRECT, I GUESS?
A. I DON'T KNOW. I DON'T KNOW IF THEY SENT THEM TO METRO. I KNOW THEY MADE THEM OUT TO ME.
Q. AND ULTIMATELY THEY GAVE YOU A DISMISSAL AND NOTICE OF RIGHTS WHERE YOU COULD COME FORTH AND COME INTO COURT LIKE TODAY; IS THAT CORRECT?
A. THAT WASN'T THROUGH -- ARE YOU SAYING THE E.E.O.C. GAVE --
Q. YES, MA'AM.
A. OH, YEAH.
Q. HOW QUICK DID YOU GO TO THE E.E.O.C., FAIRLY QUICKLY?
A. YES. I WENT, LIKE, THE WEEK AFTER I WAS DISMISSED OR A COUPLE OF DAYS, LIKE, RIGHT AFTER.
Q. -- YOU THINK YOU HAD BEEN AGGRIEVED. ANYTHING ELSE YOU DID, ANY OTHER CORRECTIVE ACTION, ANYTHING YOU DID?
A. NO, SIR, JUST TALK TO MY FAMILY ABOUT THE MATTER.
Q. NOW, YOU ALLEGED --
A. I JUST DID A LOT OF PRAYING ABOUT IT.
Q. YES, MA'AM. YOU'VE ALLEGED THAT YOU WERE VERY AFRAID AND VERY VIOLATED. WHY DIDN'T YOU SEE A DOCTOR?
A. HE DIDN'T PENETRATE ME. HE JUST TOUCHED ME, YOU KNOW. I DIDN'T -- I DIDN'T FEEL THAT I NEED TO GO TO A DOCTOR FOR THAT.
Q. WHY DIDN'T YOU SEE A THERAPIST?
A. THE FAMILY THAT I COME FROM, WE DO A LOT OF PRAYING AND I

KNOW I SAY THAT LIKE A LOT OF TIMES, BUT WE DO A LOT OF PRAYING AND THAT'S WHERE WE GET OUR STRENGTH FROM. SO I DIDN'T GO -- EVEN THOUGH I FELT -- EVEN TO THIS DAY I FEEL LIKE I SHOULD HAVE BECAUSE I HAVE A LOT OF, LIKE, RESENTMENT FROM THAT IN ME. I FEEL THAT I SHOULD HAVE, BUT I DIDN'T BECAUSE WE ALWAYS SAYING -- MY MOM, MY SISTER SAYING PRAY ABOUT IT, PRAY ABOUT IT, BUT I FEEL LIKE I SHOULD HAVE SEEK HELP.
Q. SO YOU BELIEVE THE FERVENT PRAYERS OF A RIGHTEOUS MAN AVAILETH MUCH.
A. I BELIEVE THAT, YOU KNOW, BEING A CHRISTIAN AND I'VE SEEN MIRACLES HAPPEN IN MY LIFE AND I'VE SEEN --
Q. PRAYER CHANGES THINGS.
A. YES, I BELIEVE IN THAT.
Q. DID YOU TALK TO YOUR PASTOR ABOUT IT?
A. NO, SIR.
Q. AFTER ALLEGEDLY COMPLAINING TO MR. FLAGGS DID YOU SEND HIM A TEXT TO CONFIRM WHAT YOU HAD DISCUSSED WITH HIM?
A. I DID TEXT MR. FLAGGS ABOUT THE SITUATION, AND HE SAID HE WAS GOING TO HANDLE IT. HE SAID HE WAS GOING TO TALK TO DR. HENSON. AND AT ONE POINT HE TOLD ME HE DID MENTION THIS AND HE DID SAY SOMETHING TO DR. HENSON ABOUT IT.
Q. DO YOU HAVE THAT TEXT WITH YOU HERE TODAY?
A. NO, SIR, I DON'T HAVE IT.
Q. HAVE YOU PROVIDED THAT TEXT TO YOUR COUNSEL?
A. NO, SIR.

Q. DID YOU E-MAIL HIM ABOUT IT?
A. NO, SIR.
MR. VILLINES: ONE SECOND.
THE WITNESS: OKAY.
BY MR. VILLINES:
Q. ANY OTHER LETTERS OR TANGIBLE DOCUMENTARY EVIDENCE YOU GAVE TO MR. FLAGG (VERBATIM) OR ANYBODY ELSE IN A SUPERVISORY POSITION AT METRO DENTAL ABOUT WHAT HAD HAPPENED?
A. NO, SIR. WILLIAM FLAGGS WAS THE ONLY SUPERVISOR AT METRO DENTAL.
Q. WAS WILL FLAGGS YOUR SUPERVISOR?
A. YES, SIR.
Q. I APOLOGIZE FOR THE BRIEF DELAY. I'M TRYING TO FIND SOMETHING. RIGHT NOW I'M JUST WALKING AROUND IN THE WILDERNESS. DO YOU RECALL WHEN I TOOK YOUR DEPOSITION?
A. YES, SIR.
Q. BACK ON JUNE 15TH, 19 -- 2015 I ASKED YOU, DO YOU HAVE ANY DOCUMENTS, E-MAILS, TEXT RECORDING, EITHER AUDIO OR VISUAL, REGARDING THE ALLEGATIONS YOU'RE MAKE REGARDING DR. HENSON. DO YOU RECALL YOUR RESPONSE?
A. YES, SIR.
Q. WHAT WAS IT?
A. I SAID THE SAME THING I SAID TODAY.
Q. OKAY. AND YOU'RE RIGHT?
A. YES, SIR.

MS. MARTIN: EXCUSE ME, YOUR HONOR. I APOLOGIZE. WE'RE HAVING A LOT OF TROUBLE HEARING YOU, COUNSEL.

MR. VILLINES: SURE. I'LL TRY TO SPEAK UP A LITTLE BIT.

MS. MARTIN: THAT WOULD BE GREAT. THAT'S FANTASTIC. THANK YOU.

MR. VILLINES: OKAY.

BY MR. VILLINES:

Q. DID MR. FLAGGS EVER BRING YOU IN AND TALK TO YOU ABOUT THINGS GOING ON AT THE OFFICE OR COUNSEL YOU? I USE COUNSELING NOT IN A MENTAL HEALTH, BUT COUNSEL TO TALK TO YOU ABOUT WHAT WAS GOING ON?

A. NO, SIR.

Q. WHEN YOU WERE ON DENTAL POST; IS THAT CORRECT?

A. YES, SIR.

Q. HOW MANY INTERVIEWS DID YOU DO PERSONALLY?

A. ROUGHLY FIVE.

Q. DO YOU KNOW IF THEY EVER CALLED METRO DENTAL OR IF THEY EVER CALLED DENTURE PLACE TO CHECK ON ANY?

A. NO, SIR. I HAD THEM LISTED AS MY FORMER EMPLOYER, YES, SIR.

MR. VILLINES: SURE. YOUR HONOR, I'M JUST ABOUT THROUGH.

THE COURT: OKAY.

MR. VILLINES: LET ME JUST RE-CHECK OVER THIS.

THE COURT: THAT'S FINE.

MR. VILLINES: LET ME CHECK WITH CO-COUNSEL. HE'S YOUNGER AND BRIGHTER THAN ME.

BY MR. VILLINES:

Q. DO YOU EVER RECALL TEXTING WILL ABOUT ANYTHING ON FATHER'S DAY?

A. ON FATHER'S DAY?

Q. DO YOU RECALL SENDING HIM AN INAPPROPRIATE TEXT?

A. NO, SIR.

Q. WHEN YOU LEFT DR. HENSON'S PERSONAL OFFICE TO TALK TO WILL, WHERE ARE YOU HAVING THESE CONVERSATIONS? I THINK YOU SAID SEVERAL CONVERSATIONS WITH WILL.

A. AT THE FRONT DESK.

Q. OKAY.

A. RIGHT IN FRONT OF TRACY, TRACY LOVELACE.

Q. DO YOU RECALL IF ANYONE ELSE WAS AT THE FRONT DESK AT THE TIME OTHER THAN TRACY?

A. NO ONE BUT TRACY, WILL AND MYSELF.

Q. AND, AGAIN, NOT TO BE REDUNDANT. I WANT TO BE SURE I UNDERSTAND. ANY OTHER CONVERSATION YOU HAD WITH WILL REGARDING THIS TYPE ALLEGED BEHAVIOR, WERE THEY HELD AT THE FRONT DESK WITH WILL AND ONE IN THE OFFICE; IS THAT CORRECT?

A. AS FAR AS?

Q. OF WHAT HAD HAPPENED WITH DR. HENSON?

A. REFRESH ME ON WHAT YOU'RE SAYING. I'M NOT UNDERSTANDING.

Q. SURE. YOU JUST GOT THROUGH SAYING THAT YOU HAD A CONVERSATION WITH WILL AT THE FRONT DESK IN THE PRESENCE OF TRACY. HOW MANY OF THESE CONVERSATIONS DID YOU HAVE?
A. AT LEAST THREE CONVERSATIONS. EVERY -- IT WASN'T REALLY A CONVERSATION. IT WAS TELLING WILL WHAT HAPPENED, JUST HAPPENED IN THE OFFICE.
Q. AND WOULD THAT BE AT THE FRONT DESK AND WOULD TRACY BE PRESENT AT THE FRONT DESK ON ALL THOSE OCCASIONS?
A. AT LEAST TWO OCCASIONS TRACY, SHE HEARD ME TELLING WILL.
Q. SO MAYBE ON ONE OCCASION SHE WASN'T PRESENT AT THE FRONT DESK; IS THAT CORRECT?
A. SHE WAS THERE AT LEAST TWICE.
Q. OKAY.
A. YES, SIR.
Q. SO SHE WAS PRESENT AT LEAST TWICE AT THE FRONT DESK?
A. YES, SIR. SHE COMMENTED ON ONE -- ONE TIME WHEN SHE HEARD ME, SHE SAID DON'T LET HIM TOUCH ME.
MR. VILLINES: YOUR HONOR, THANK YOU. THAT'S ALL I HAVE.
THE COURT: OKAY. THANK YOU.
MS. MARTIN, ANY REDIRECT?
MS. MARTIN: JUST ONE MOMENT, YOUR HONOR.
THE COURT: OKAY.

REDIRECT EXAMINATION

BY MS. MARTIN:

Q. MS. POLLARD, I JUST HAVE A COUPLE OF FOLLOW-UP QUESTIONS FOR YOU.

A. YES, MA'AM.

Q. MR. VILLINES ASKED YOU WHETHER OR NOT YOU HAD --

MR. VILLINES: MS. MARTIN, I'M GOING TO ASK YOU TO DO THE SAME THING.

MS. MARTIN: IT'S DIFFICULT TO HEAR RIGHT HERE. I UNDERSTAND.

MR. VILLINES: YES, MA'AM. THANK YOU.

BY MS. MARTIN:

Q. MR. VILLINES WAS ASKING YOU WHETHER YOU SENT ANY E-MAILS TO MR. FLAGGS TELLING HIM ABOUT THE INAPPROPRIATE BEHAVIOR OR ANY LETTERS TO HIM. WAS THERE ANY POLICY AT THE ATLANTA OFFICE THAT TOLD YOU TO PUT THINGS IN WRITING IF YOU WERE BEING SEXUALLY HARASSED?

A. NO, MA'AM.

Q. WERE YOU EVER TOLD IF YOU WERE SEXUALLY HARASSED THAT THE PROCEDURE WOULD BE TO SEND AN E-MAIL TO THE OFFICE MANAGER?

A. NO, MA'AM.

Q. WERE YOU EVER TOLD THAT IF YOU'RE BEING SEXUALLY HARASSED THE PROCEDURE WOULD BE FOR YOU TO PUT SOMETHING IN A LETTER TO THE OFFICE MANAGER?

A. NO, MA'AM.

MS. MARTIN: NO FURTHER QUESTIONS, YOUR HONOR.

THE COURT: OKAY. THANK YOU.

MS. POLLARD, YOU CAN STEP DOWN. THANK YOU.

MS. MARTIN: YOUR HONOR, MAY WE HAVE A QUICK SIDEBAR?

THE COURT: YES.

(BENCH CONFERENCE.)

MS. MARTIN: YOUR HONOR, I APOLOGIZE. MY PARTNER, MY FATHER IS DIABETIC AND HE'S HAVING AN ISSUE AND HE NEEDS TO GET TO A PHARMACY. WE APOLOGIZE. IS THERE ANY WAY WE CAN END TODAY SO WE CAN TAKE HIM? HE CAN EXPLAIN THE SITUATION TO YOU.

MR. MARTIN: I'M GOING TO DEPOSE THE NEXT WITNESS AND IT'S GOING TO BE MUCH LONGER THAN A HALF AN HOUR AND I WOULD RATHER NOT GET STARTED, PLUS IT'S BEEN A LONG DAY.

THE COURT: WELL, IF YOU'RE HAVING A MEDICAL EMERGENCY, THERE'S --

MR. MARTIN: WELL, IT'S NOT A MEDICAL EMERGENCY, BUT IT'S BEEN A LONG DAY FOR ME.

THE COURT: ARE WE ON TRACK IN TERMS OF WHERE YOU THOUGHT YOU WOULD BE AT TODAY IN TERMS OF WITNESSES?

MS. MARTIN: YEAH, AND I THINK WE CAN GET THROUGH VERY QUICKLY TOMORROW. THE WITNESSES AFTER MS. POLLARD I THINK ARE VERY TAILORED TO WHAT WE NEED TO GET THROUGH.

THE COURT: OKAY. WE CAN DO THAT. DO YOU HAVE ANY OBJECTION, MR. VILLINES?

MR. VILLINES: NONE AT ALL, NONE AT ALL.

THE COURT: OKAY THANK YOU.

(IN OPEN COURT.)

THE COURT: SO, LADIES AND GENTLEMEN OF THE JURY, IT LOOKS LIKE THE NEXT WITNESS IS GOING TO TAKE QUITE A BIT MORE TIME, SO RATHER THAN STARTING A WITNESS AND KIND OF ENDING IN THE MIDDLE OF THE WITNESS, WE'RE GETTING CLOSE TO 5:00 AND I KNOW NONE OF Y'ALL WERE EXPECTING TO BE ON A JURY NECESSARILY TODAY, SO WHAT WE'RE GOING TO DO IS END A LITTLE BIT EARLY. WE'RE STILL ON TRACK FOR WHERE WE'RE SUPPOSED TO BE, SO IT SHOULDN'T TAKE US OFF SCHEDULE IN ANY WAY. SO WHAT I'M GOING TO DO IS I'M GOING TO LET YOU LEAVE FOR TODAY. THE IMPORTANT INSTRUCTION THAT I WILL GIVE YOU ONCE AGAIN AND YOU WILL GET SICK OF HEARING IT IS DON'T TALK TO ANYONE ABOUT THE CASE, ANYTHING YOU'VE HEARD TODAY, DON'T SHARE ANY OPINIONS ABOUT THE CASE, DON'T DO ANYTHING ON SOCIAL MEDIA RELATED TO THE CASE, DON'T DO ANY RESEARCH ABOUT THE CASE. IT'S JUST VERY IMPORTANT THAT ALL YOUR DELIBERATIONS HAPPEN WITH THE OTHER JURORS AT THE TIME WHEN I INSTRUCT YOU TO BEGIN DELIBERATIONS AND THAT ALL THE INFORMATION YOU GET ABOUT THE TRIAL COMES FROM WHAT YOU HEAR AND IN THE COURTROOM.

A FEW OTHER HOUSEKEEPING MATTERS, WE WILL START TOMORROW AT 9:00 A.M. SHARP. AND WE CAN'T START UNTIL ALL OF YOU ARE HERE. SO IF SOMEONE'S LATE, WE'VE GOT THIS WHOLE KIND OF APPARATUS THAT'S WAITING FOR YOU, SO IT'S VERY IMPORTANT FOR YOU TO BE ON TIME. IF FOR SOME REASON THERE IS AN EMERGENCY, YOU'LL HAVE

MS. BACHELOR'S NUMBER, AND IT'S IMPORTANT YOU CALL IN SO WE KNOW EXACTLY WHAT'S GOING ON WITH YOU. I WILL TELL YOU THAT, IF YOU HAVEN'T NOTICED ALREADY, THE TEMPERATURE IN HERE IS A LITTLE ERRATIC AT TIMES. IT TENDS TO BE COLD OR HOT, DOESN'T SEEM TO BE ALWAYS COMFORTABLE AND WE DON'T HAVE A THERMOSTAT, SO WE CAN'T CONTROL IT IN HERE. SO IT'S A GOOD IDEA TO DRESS IN LAYERS IN CASE IT GETS HOT OR IT GETS COLD YOU HAVE A SWEATER. YOU HAVE ACCESS TO THE REFRIGERATOR, SO IF YOU WANT TO BRING YOUR LUNCH TOMORROW OR BRING ANYTHING WITH YOU, YOU CAN. AS I MENTIONED BEFORE, YOU WILL HAVE BREAKFAST. IT'S NOT ANYTHING FANCY, BUT YOU WILL HAVE SOME DANISHES AND FRUIT AND THINGS LIKE THAT, MUFFINS AND JUST, THINGS SUCH AS THAT. TOMORROW WILL PROBABLY BE VERY SIMILAR TO THIS AFTERNOON. YOU'LL PROBABLY HEAR TESTIMONY THROUGH MOST OF THE DAY TOMORROW. SO IT WILL BE KIND OF BREAKS LIKE WE HAD THIS AFTERNOON, A SIMILAR LUNCH BREAK, AND WE'LL JUST PROCEED VERY SIMILARLY TO TODAY TOMORROW. SO, WITH THAT, I WANT TO THANK YOU AGAIN. I APPRECIATE ALL YOUR ATTENTION AND YOUR SERVICE. AND, WITH THAT, YOU ARE EXCUSED 'TIL TOMORROW AT 9:00 A.M. THANK YOU.

EVERYONE RISE FOR THE JURY.

(JURY EXCUSED.)

THE COURT: OKAY. IF Y'ALL CAN BE SEATED. JUST A FEW MATTERS I HAD ON MY LIST. MS. MARTIN, I NOTICED ON A FEW OF THE EXHIBITS MS. POLLARD'S SOCIAL SECURITY NUMBER HAS BEEN LEFT ON THERE, SO IF YOU COULD JUST GO THROUGH THE EXHIBITS THAT YOU

TEND TO ADMIT INTO EVIDENCE AND JUST GIVE MS. BACHELOR A REDACTED COPY WITH JUST THE SOCIAL SECURITY -- I DON'T THINK THERE'S PROBABLY A PROBLEM, BUT IT'S JUST BETTER NOT TO HAVE THAT ON THE COURT'S EXHIBITS. IN TERMS OF JURY CHARGES, I WAS HOPING TO GET THOSE ON FRIDAY AT NOON. I DIDN'T GET THOSE UNTIL TODAY, SO I HAVEN'T HAD A CHANCE TO WORK OUT MY OWN DRAFT OF THOSE YET, BECAUSE I'VE BEEN HERE WITH YOU TODAY. BUT WHAT WE'LL LIKELY DO IS SOMETIME DURING THE DAY TOMORROW I WILL HAVE A COPY OF MY FIRST DRAFT OF THE JURY CHARGES. AND SINCE IT'S LIKELY THAT WE'LL PROBABLY CHARGE THE JURY MAYBE AS SOON AS WEDNESDAY, WHAT WE'LL PROBABLY DO IS HAVE A CHARGE CONFERENCE TOMORROW AFTERNOON AFTER THE JURY LEAVES, WE'LL SEE WHERE WE ARE, BUT JUST PLAN ON STAYING A LITTLE LATER TOMORROW SO THAT WE CAN HAVE THE CHARGE CONFERENCE AFTER THE JURY LEAVES. SO WE'LL PLAN ON DOING THAT UNLESS FOR SOME REASON SOMETHING CHANGES ABOUT THE COURSE OF THE TRIAL. AND I THINK THAT'S ABOUT IT. I ASSUME WE'RE STILL KIND OF ON TRACK FOR ENDING ON WEDNESDAY, SO EVERYTHING I THOUGHT WENT VERY SMOOTHLY TODAY, SO I DON'T REALLY HAVE ANYTHING ELSE I WANTED TO TALK TO YOU ABOUT. THE ONLY THING THAT I'LL ADD IS THAT, ALTHOUGH I ENJOY TRIAL, I THINK IT'S VERY INTERESTING AND I'M NOT A JUDGE THAT DOESN'T LIKE TRIAL. I LIKE TO BE IN TRIAL. THERE'S ALWAYS AN OPPORTUNITY THROUGHOUT THE TRIAL FOR YOU TO TALK AGAIN ABOUT SETTLEMENT. I KNOW THAT IN THE PRETRIAL ORDER THERE WAS NO POSSIBILITY OF SETTLEMENT, BUT THAT'S ALWAYS -- I'VE SEEN A LOT OF CASES SETTLE

WHERE THERE WAS NO POSSIBILITY OF SETTLEMENT, SO JUST WANT YOU TO KEEP THAT DIALOGUE OPEN TO THE EXTENT THAT IT WOULD BE HELPFUL. IF NOT, WE WILL KEEP GOING AND, LIKE I SAID, I HAVE NO PROBLEM DOING THAT. I THINK IT'S ALL GOING VERY WELL. AND IS THERE ANYTHING THAT EITHER OF YOU WANTED TO TAKE UP THAT YOU THINK MIGHT BE AN ISSUE TOMORROW?

MS. MARTIN: JUST ONE THING, YOUR HONOR. SOMETHING CAME UP TODAY WHICH I BELIEVE WILL LEAD TO THE PLAINTIFF'S WANTING TO ASK FOR ANOTHER JURY CHARGE. I'M GOING TO RESEARCH IT TONIGHT, AND IF SO DRAFT IT. I'LL PROVIDE IT TO OPPOSING COUNSEL FOR HIS REVIEW AND RESPONSE TO THAT. HOW SHOULD I GET IT TO THE COURT?

THE COURT: WHY DON'T YOU SEND IT BY E-MAIL TONIGHT TO MS. BACHELOR AND JUST BE HERE IN CASE WE NEED TO GET TOGETHER AT 8:45. I HAVE SOMETHING ELSE AT 8:30, BUT IF IT'S SOMETHING THAT WE NEED TO TAKE UP, WE'LL TRY TO DO THAT AT 8:45 IF THAT BECOMES AN ISSUE.

MS. MARTIN: OKAY. AND THE ONLY OTHER ISSUE ON MY LIST OF THINGS, YOUR HONOR, MAY WE LEAVE OUR ITEMS HERE? WE'LL TAKE OUR COMPUTERS, BUT CAN WE LEAVE OUR BINDERS AND DOCUMENTS HERE?

THE COURT: YOU ARE THE ONLY PEOPLE IN HERE FOR NOW, SO YOU CAN LEAVE WHATEVER YOU WANT TO HERE. WE'LL LOCK THE COURTROOM SHORTLY AFTER YOU EXIT, AND ANYTHING THAT YOU WANT TO LEAVE HERE IS GOING TO BE SAFE. THAT'S FINE.

MS. MARTIN: OKAY. THANK YOU.

THE COURT: IT'S A FEDERAL COURTHOUSE, SO IF SOMEONE WERE TO EVEN MESS WITH THEIR COMPUTERS, THEY WOULD BE VERY BRAVE. LET'S PUT IT THAT WAY, SO, YES, THAT'S NOT A PROBLEM.

MR. VILLINES: THAT MEANS I MIGHT GET MY NOTEBOOK THAT I LOST DOWN AT SECURITY?

THE COURT: I DON'T KNOW. IT'S WORTH A TRY.

MR. VILLINES: I HAD ONE THING, YOUR HONOR, IF MS. MARTIN'S FINISHED --

MS. MARTIN: I'M DONE, YES.

THE COURT: OKAY.

MR. VILLINES: MR. FILIPOVITS WILL NOT BE HERE TOMORROW. IT'S NO DISRESPECT TO THE COURT. HE HAS TO BE IN ANOTHER COURT TOMORROW. SO I APPRECIATE HIM SITTING HERE, BUT HE HAS --

THE COURT: NO, NO DISRESPECT. AND I UNDERSTAND WE HAVE LOTS OF FAMILY SITUATIONS HERE. SO IT'S NICE TO SEE, I ASSUME, FATHER AND DAUGHTER AND FATHER, SON-IN-LAW.

MR. VILLINES: CORRECT.

THE COURT: SO IT'S NICE TO HAVE THE MULTI-GENERATIONAL LAWYERS HERE IN THE COURTROOM. THAT'S USUALLY NOT TYPICAL AND CERTAINLY NOT TYPICAL AT THE SAME TIME. SO THAT'S ALL I HAD. SO WE'LL JUST -- IF WE NEED TO GET TOGETHER AT 8:45, WE WILL. IF NOT, WE'LL START AT 9. AND IF SOMETHING COMES UP, JUST E-MAIL MS. BACHELOR. SHE THANKFULLY

FOR ME CHECKS HER E-MAIL RATHER REGULARLY AND WILL GET IN TOUCH WITH ME IF THERE'S ANYTHING THAT WE NEED. SO, WITH THAT, HAVE A NICE EVENING AND I WILL SEE YOU TOMORROW.

(PROCEEDINGS RECESSED.)

C E R T I F I C A T E

UNITED STATES OF AMERICA

NORTHERN DISTRICT OF GEORGIA

I, MONTRELL VANN, RPR, RMR, RDR, CRR, OFFICIAL COURT REPORTER OF THE UNITED STATES DISTRICT COURT, FOR THE NORTHERN DISTRICT OF GEORGIA, ATLANTA, DO HEREBY CERTIFY THAT THE FOREGOING 94 PAGES CONSTITUTE A TRUE TRANSCRIPT OF PROCEEDINGS HAD BEFORE THE SAID COURT, HELD IN THE CITY OF ATLANTA, GEORGIA, IN THE MATTER THEREIN STATED.

IN TESTIMONY WHEREOF, I HEREUNTO SET MY HAND ON THIS, THE 13TH DAY OF MAY 2016.

/S/ MONTRELL VANN
MONTRELL VANN, RPR, RMR, RDR, CRR
OFFICIAL COURT REPORTER
UNITED STATES DISTRICT COURT